[No. A097107. First Dist., Div. Two. Feb. 24, 2003.]

CALIFORNIA ADVOCATES FOR NURSING HOME REFORM et al.,
Plaintiffs and Appellants, v.
DIANA M. BONTA´, as Director, etc., et al., Defendants and
Respondents.

## COUNSEL

Amitai Schwartz for Plaintiffs and Appellants.

Bill Lockyer, Attorney General, Charlton G. Holland III, Assistant Attorney General, and James M. Humes, Deputy Attorney General, for Defendants and Respondents.

## OPINION

**KLINE, P. J.**—Appellants allege that written and unwritten policies, procedures and guidelines of the state Department of Health Services interpreting federal and state statutes relating to the Medicaid[1] program, which the department administers, constitute regulations within the meaning of the Administrative Procedure Act (Gov. Code, § 11340 et seq.) (APA) and are therefore void because they were not promulgated in accordance with the APA. The trial court disagreed and granted summary judgment for the department. We agree with appellants that the department failed to dispositively demonstrate the absence of a triable issue of material fact or that appellants' claim lacks legal merit. Accordingly, we shall reverse the judgment.

[1] Title 42 United States Code section 1396 et seq. (hereinafter Medicaid).

## I. FACTUAL AND PROCEDURAL BACKGROUND

This litigation was commenced by California Advocates for Nursing Home Reform (CANHR), a California not-for-profit corporation which advocates on behalf of individuals eligible for benefits under the federal Medicaid program and their families, and Patricia McGinnis, the executive director of CANHR (collectively appellants), against Diana M. Bonta´, the Director of the State Department of Health Services, as well as other department officials, all of whom are sued in their official capacities, as well as the department itself (collectively DHS or the department).

The issues appellants have raised all relate to an aspect of the Medicaid program known as "estate recovery," which is later described. Appellants' central claim is that the "skeletal regulations" relating to this subject which DHS properly promulgated pursuant to the APA (set forth in §§ 50960-50965 of tit. 22 of the Cal. Code Regs.) do not address or include DHS's *current* policies, choices and practices regarding the subject. According to appellants, the policies, choices and practices DHS actually employs "exist instead in written and unwritten procedures, rules, guidelines, even in e-mail messages from the Department's estate recovery managers. They have not been noticed to the public. They have not been published in the California Code of Regulations. They have not been submitted to the OAL [Office of Administrative Law] for approval. They are house rules—underground regulations upon which defendants rely in demanding repayment of thousands of dollars from the modest estates of deceased Medi-Cal recipients."

The complaint, filed on September 15, 2000, alleges that respondents' "underground guidelines and criteria" violate not just the APA but also provisions of the Welfare and Institutions Code relating to estate recovery because they conflict with published regulations on that subject which were validly enacted. The complaint sought declaratory and injunctive relief, restitution, and a peremptory writ of mandate pursuant to Code of Civil Procedure section 1085.

On July 13, 2001, the parties filed competing motions for summary judgment. Two months later, on September 17, the court denied appellants' motion and granted that of respondents. On that basis, the court entered judgment in favor of the department on November 9, 2001. This timely appeal followed.

## II. DISCUSSION

### A. *Standard of Review.*

In order to prevail, a defendant who has filed a motion for summary judgment must " 'show[] that one or more elements of the cause of action

. . . cannot be established' by the plaintiff. [Citation.] In other words, all that the defendant need do is to show that the plaintiff cannot establish at least one element of the cause of action—for example, that the defendant cannot prove element X. Although he remains free to do so, the defendant need not himself conclusively negate any such element—for example, himself prove not X." (*Aguilar v. Atlantic Richfield* (2001) 25 Cal.4th 826, 853-854 [107 Cal.Rptr.2d 841, 24 P.3d 493], fn. omitted.) Once the moving defendant has met its burden, the burden shifts to the plaintiff to show that a triable issue of fact exists as to the cause of action or the defense thereto. (Code Civ. Proc., § 437c, subd. (*o*)(2); *Aguilar*, at p. 849.) ■ On appeal, this court exercises its independent judgment in determining whether there are triable issues of material fact and whether the moving party is entitled to judgment as a matter of law. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334-335 [100 Cal.Rptr.2d 352, 8 P.3d 1089].)

As will be seen, the trial court did not grant summary judgment for DHS solely on the ground that there is no triable issue as to any material fact; indeed, it implicitly acknowledged the truth of many of appellants' factual assertions. Summary judgment was granted in large part on the ground that certain internal policy directives which DHS indisputably issued were not "regulations" within the meaning of the APA because they were "unnecessary." The trial court therefore determined not only that there was no material issue of fact to be tried, but also that appellants' action had no merit on the undisputed facts, a purely legal issue. (See *Burke Concrete Accessories, Inc. v. Superior Court* (1970) 8 Cal.App.3d 773, 775 [87 Cal.Rptr. 619].)

DHS suggests that in assessing the adequacy of its rulemaking we are obliged to defer to its determination. Relying on Evidence Code section 664 ("It is presumed that official duty has been regularly performed") and *Western Oil & Gas Assn. v. Air Resources Board* (1984) 37 Cal.3d 502, 509 [208 Cal.Rptr. 850, 691 P.2d 606] ("[a] reviewing court will not substitute its policy judgment for the agency's in the absence of an arbitrary decision"), DHS maintains that principles of separation of powers and respect for agency expertise require us to extend "substantial deference" to its determination that its rulemaking fully complies with the APA. We disagree. ■ As appellants correctly point out, the effect of the rebuttable presumption created by section 664 is merely "to impose upon the party against whom it operates the burden of proof as to the nonexistence of the presumed fact." (*Gee v. California State Personnel Bd.* (1970) 5 Cal.App.3d 713, 718 [85 Cal.Rptr. 762].) DHS's reliance on *Western Oil & Gas Assn. v. Air Resources Board* is unjustified because that case related to an agency's

substantive policy decisions in its area of expertise (air quality standards), not to whether the agency's rulemaking process complied with the APA, a matter as to which the agency has no greater expertise than the courts.

The APA was designed in part to prevent the use by administrative agencies of "underground" regulations (*Kings Rehabilitation Center, Inc. v. Premo* (1999) 69 Cal.App.4th 215, 217 [81 Cal.Rptr.2d 406]), and it is the courts, not administrative agencies, which enforce that prohibition. "[A]gencies are normally not empowered to determine, in an authoritative way, the decision-making criteria that relevant statutes require them to consider when they formulate and adopt rules. As a result, courts must review wholly de novo the propriety of the decision-making criteria utilized by agencies when they make rules. That is, in almost every instance involving the judicial review of a rule, courts are entitled to substitute their judgments for those of the agencies on this question of law. They need not defer to any extent to the judgment of the agencies on such matters. The same is true with respect to compliance by agencies with applicable procedural requirements. Agencies are not normally delegated power to determine authoritatively whether they complied with generally applicable rule-making procedures, . . . As a result, courts may usually determine the lawfulness of agencies' compliance with those rule-making procedures entirely de novo, simply substituting their judgment on that question for that of the agencies." (Bonfield, State Administrative Rule Making (1986) § 9.2.12, p. 582.)

B. *Pertinent Provisions of the Administrative Procedure Act.*

The APA provides that "[n]o state agency shall issue, utilize, enforce, or attempt to enforce any guideline, criterion, bulletin, manual, instruction, order, standard of general application, or other rule, which is a regulation as defined in [Government Code] Section 11342.600, unless the guideline, criterion, bulletin, manual, instruction, order, standard of general application, or other rule has been adopted as a regulation and filed with the Secretary of State . . . ." (Gov. Code, § 11340.5, subd. (a).)[2]

"Regulation" is defined in the APA as "every rule, regulation, order, or standard of general application or the amendment, supplement, or revision of any rule, regulation, order, or standard adopted by any state agency to implement, interpret, or make specific the law enforced or administered by it, or to govern its procedure, . . ." (Gov. Code, § 11342.600.) "A

---

[2]The statutes that authorize the Director of DHS to adopt such regulations, orders, or standards of general application, also mandate that this be done only in accordance with the APA. (Welf. & Inst. Code, §§ 10725, 14124.5.)

regulation subject to the APA thus has two principal identifying characteristics. (See *Union of American Physicians & Dentists* v. *Kizer* (1990) 223 Cal.App.3d 490, 497 [272 Cal.Rptr. 886] . . . .) First, the agency must intend its rule to apply generally, rather than in a specific case. The rule need not, however, apply universally; a rule applies generally so long as it declares how a certain class of cases will be decided. (*Roth v. Department of Veterans Affairs* (1980) 110 Cal.App.3d 622, 630 [167 Cal.Rptr. 552].) Second, the rule must 'implement, interpret, or make specific the law enforced or administered by [the agency], or . . . govern [the agency's] procedure.' (Gov. Code, § 11342, subd. (g).)" (*Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 571 [59 Cal.Rptr.2d 186, 927 P.2d 296].)

If a rule constitutes a "regulation" within the meaning of the APA (other than an "emergency regulation," which may not remain in effect more than 120 days)[3] it may not be adopted, amended, or repealed except in conformity with "basic minimum procedural requirements" (Gov. Code, § 11346, subd. (a)) that are exacting. The agency must give the public notice of its proposed regulatory action (*id.*, §§ 11346.4, 11346.5); issue a complete text of the proposed regulation with a statement of the reasons for it (*id.*, § 11346.2, subds. (a), (b)); give interested parties an opportunity to comment on the proposed regulation (*id.*, § 11346.8); respond in writing to public comments (*id.*, §§ 11346.8, subd. (a), 11346.9); and forward a file of all materials on which the agency relied in the regulatory process to the Office of Administrative Law (*id.*, § 11347.3, subd. (b)), which reviews the regulation for consistency with the law, clarity, and necessity. (*Id.*, §§ 11349.1, 11349.3.) Any regulation or order of repeal that substantially fails to comply with these requirements may be judicially declared invalid. (*Id.*, § 11350.)

"One purpose of the APA is to ensure that those persons or entities whom a regulation will affect have a voice in its creation (*Armistead v. State Personnel Board* (1978) 22 Cal.3d 198, 204-205 [149 Cal.Rptr. 1, 583 P.2d 744] . . .), as well as notice of the law's requirements so that they can conform their conduct accordingly (*Ligon v. State Personnel Board* (1981) 123 Cal.App.3d 583, 588 [176 Cal.Rptr. 717] . . .). The Legislature wisely perceived that the party subject to regulation is often in the best position, and has the greatest incentive, to inform the agency about possible unintended consequences of a proposed regulation. Moreover, public participation in the regulatory process directs the attention of agency policymakers to the public they serve, thus providing some security against bureaucratic tyranny. (See *San Diego Nursery Co. v. Agricultural Labor Relations Bd.* (1979) 100

---

[3]See Government Code section 11346.1.

Cal.App.3d 128, 142-143 [160 Cal.Rptr. 822].)" (*Tidewater Marine Western, Inc. v. Bradshaw, supra*, 14 Cal.4th at pp. 568-569.)

The written and unwritten DHS rules which, according to appellants, are required by the APA to be, but were not promulgated in the manner mandated by that act, all relate to federal and state statutes pertaining to recovery by the government of the cost of Medicaid benefits from the estates of recipients who owned valuable residential property that was exempt from consideration at the time they were deemed eligible to receive such benefits.

C. *Overview of the Estate Recovery Statutes.*

The Medicaid program, established in 1965 as title XIX of the Social Security Act, "is designed to provide medical assistance to persons whose income and resources are insufficient to meet the costs of necessary care and services. See *Schweiker v. Hogan*, 457 U.S. 569, 571 [102 S.Ct. 2597, 2600, 73 L.Ed.2d 227] (1982). The Federal Government shares the costs of Medicaid with States that elect to participate in the program. In return, participating States are to comply with requirements imposed by the Act and by the Secretary of Health and Human Services. See 42 U.S.C. § 1396a (1982 ed. and Supp. II); *Schweiker v. Gray Panthers*, 453 U.S. 34, 36-37 [101 S.Ct. 2633, 2636-2637, 69 L.Ed.2d 460] (1981)." (*Atkins v. Rivera* (1986) 477 U.S. 154, 156-157 [106 S.Ct. 2456, 2458, 91 L.Ed.2d 131].) Persons qualify for Medicaid benefits if they are aged, blind, disabled or the parent of a minor child, and their income and resources are insufficient to meet the costs of necessary care and services for the child, as measured by specified statutory criteria. (42 U.S.C. § 1396a; see also *Atkins v. Rivera, supra*, 477 U.S. at p. 156 [106 S.Ct. at p. 2458].) However, because an applicant's principal residence is excluded as a countable resource in determining eligibility (see 42 U.S.C. § 1382b(a)(1)), some persons who possess valuable assets are allowed to receive benefits.[4] Congress justified this incongruity by authorizing "estate recovery," that is, the recovery of all or a portion of the benefits paid from the estate of such a beneficiary after his or her death.

Prior to 1993, states were permitted, but not required, to establish estate recovery programs. The mandatory estate recovery provision was enacted by

---

[4]"The Supplemental Security Income ('SSI') program excludes an individual's principal residence from consideration as a countable resource. *See* 42 U.S.C. § 1382b(a)(1). SSI rules generally govern Medicaid eligibility of the aged, blind and disabled. Thus, this exclusion also applies to Medicaid. *See* 42 U.S.C. §§ 1396a(a)(10)(A)(i)(II), 1396a(a)(10)(A)(ii)(V) and 1396a(a)(10)(A)(ii)(III); 20 C.F.R. § 416.1212." (*West Virginia ex rel. McGraw v. D.H.H.S.* (S.D.W.Va. 2001) 132 F.Supp.2d 437, 440, fn. 2, affd. by *West Virginia v. U.S. Dept. Health and Human Serv.* (4th Cir. 2002) 289 F.3d 281.)

Congress as part of the Omnibus Budget Reconciliation Act of 1993 (OBRA '93). Its purpose was "to counterbalance rocketing Medicaid expenditures and overall budget and deficit reductions. [Citation.] Congress sought a way to stymie the growth in state Medicaid expenditures without depriving eligible recipients of much-needed care. [Citation.] Thus, although states could allow Medicaid recipients to retain their homes during their lifetime, Congress began requiring states to recoup benefits from the estates of certain deceased Medicaid recipients as a condition of receiving Medicaid funds. [Citations.]" (*West Virginia ex rel. McGraw v. D.H.H.S., supra,* 132 F.Supp.2d 437, 440.) Specifically, OBRA '93 required each state to include in its state plan a provision for making recoveries from the estates of specified classes of Medicaid recipients. (42 U.S.C. § 1396p(b)(1).) States that fail to do so risk losing all or part of their Medicaid funding. (42 U.S.C. § 1396c.) OBRA '93 does not forcibly expose citizens to estate recovery. Persons subject to estate recovery receive notice of the estate recovery requirement before they decide whether to accept or reject Medicaid benefits. A home is safeguarded from recovery if needed for the support of a recipient's spouse or dependent child, and recovery may be waived in other situations in which undue hardship can be shown. (*West Virginia ex rel. McGraw v. D.H.H.S., supra,* 132 F.Supp.2d at p. 441; 42 U.S.C. § 1396p(b)(3).)

California participates in the Medicaid program through its California Medical Assistance Program, codified as the Medi-Cal Act (Welf. & Inst. Code, § 14000.4) and set forth in sections 14000 through 14198.2 of the Welfare and Institutions Code. Complying with the federal estate recovery requirement, the Medi-Cal Act provides that, except in specified circumstances, DHS shall claim against the estate of a deceased Medi-Cal beneficiary "or against any recipient of the property of that decedent by distribution or survival an amount equal to the payments for the health care services received or the value of the property received by any recipient from the decedent by distribution or survival, whichever is less." (Welf. & Inst. Code, § 14009.5, subd. (a).) DHS may waive all or part of such a claim if it determines enforcement thereof "would result in substantial hardship to other dependents, heirs, or survivors of the individual against whose estate the claim exists." (*Id.,* § 14009.5, subd. (c)(1).)

Appellants acknowledge that DHS—more specifically, the Estate Recovery Unit of the Third Party Liability Branch of DHS, known as the ERU—has promulgated regulations implementing the federal and state statutes just described (see Cal. Code Regs., tit. 22, §§ 50960-50965), but maintain that these "skeletal" regulations merely provide a general definition of the "estate" that is subject to recovery, describe the required notice that must be

given, set forth some of the criteria for "hardship waivers" and provide for administrative hearings when a hardship waiver is requested. However, according to appellants, DHS seeks estate recovery not only from probate estates, joint tenancies, tenancies in common, survivorship and living trusts, but also from assets held or conveyed through life estates, annuities, post-death liens and "other arrangements." Recovery against such assets is permitted by the Medicaid Act, which provides that "the term 'estate', with respect to a deceased individual . . . [¶] . . . [¶] may include, at the option of the State (and shall include, in the case of an individual to whom [42 United States Code section 1396p(b)] (1)(C)(i) applies), any other real and personal property and other assets in which the individual had any legal title or interest at the time of death (to the extent of such interest), including such assets conveyed to a survivor, heir, or assign of the deceased individual through joint tenancy, tenancy in common, survivorship, life estate, living trust, or other arrangement." (42 U.S.C. § 1396p(b)(4)(B).)

## D. *The Trial Court Ruling.*

The claims set forth in the complaint fall into three categories: (1) that the "skeletal regulations" DHS has properly promulgated do not define the types of life estates it seeks to recover or the circumstances, if any, under which annuities and post-death liens are subject to recovery, or the nature of the "other arrangement[s]," if any, from which it may also seek recovery (see Cal. Code Regs., tit. 22, § 50960, subd. (b)(1)); (2) that DHS utilizes informal memoranda known as Estate Recovery Unit Policies, or ERUP's, pertaining to claims against life estates (see 42 U.S.C. § 1396p(b)(4)(B)), and creating exemptions from estate recovery, such as those applicable to certain disabled persons (see 42 U.S.C. §§ 1382c, 1396p(b)(2)), and such ERUP's effectively implement, interpret, and make specific the recovery provisions of the Medicaid Act; and (3) that DHS's determination of requests for hardship waivers are based on written and unwritten policies and practices "that create and impose additional and burdensome standards which interpret and exceed standards in published regulations regarding applications for hardship waivers."

The trial court rejected all of these claims and concluded that DHS "does not use underground regulations in administering its estate recovery program." The order denying appellants' motion for summary judgment and granting that of DHS, which was prepared by and entirely adopted the views of DHS, found that (1) DHS does not enforce claims against "other arrangements," including annuities and life insurance policies, and "regulatory elaboration" of the scope of the "estate" that is subject to recovery is

therefore unnecessary; (2) exemptions from estate recovery, such as those applicable to disabled persons, are specified by federal statutes and regulations (citing, as examples, 42 U.S.C. § 1382c(a)(3)(E); 20 C.F.R. §§ 416.901, 416.1015 (2001)) so that additional state regulations on this subject are also unnecessary; (3) DHS decisions to enforce claims against certain types of life estate arrangements and not against others are based "on legal distinctions as to what qualifies as part of the Medi-Cal recipient's estate as defined by law" which are not amenable to regulatory interpretation; (4) DHS regulations regarding hardship waivers are already comprehensive; and (5) regulations regarding liens and the collection of interest are unnecessary because DHS does not unilaterally legislate or impose liens or collect interest, but does so only when a debtor who desires to postpone payment of a claim voluntarily agrees to the lien or payment of interest, and DHS's practice in this regard does not apply generally.

We shall conclude that these findings are either based on disputed facts or legally unjustified. Consequently, they do not support the trial court's determination that the internal guidelines at issue are not "regulations" within the meaning of the APA, and they cannot support the grant of summary judgment.

E. *DHS's Informal Internal Guidelines Are Policies Constituting Regulations Within the Meaning of the APA.*

1. *Policies as to Whether Annuities and Life Estates Are Within the Scope of the Estate Subject to Recovery.*

As earlier noted, the Medicaid Act gives the states the option to recover against "assets conveyed to a survivor, heir, or assign of the deceased individual [recipient] through joint tenancy, tenancy in common, survivorship, life estate, living trust, or *other arrangement.*" (42 U.S.C. § 1396p(b)(4)(B), italics added.) California has exercised this option. The state Medi-Cal Act provides that, except in specified situations (see Welf. & Inst. Code, § 14009.5, subds. (b), (c)), DHS "shall claim against the estate of the decedent, or against any recipient of the property of that decedent by distribution or survival an amount equal to the payments for the health care services received or the value of the property received by any recipient from the decedent by distribution or survival, whichever is less." (Welf. & Inst. Code, § 14009.5, subd. (a).) The Medi-Cal Act does not use the phrase "other arrangement," but it is employed in a properly promulgated DHS regulation defining the "estate" subject to recovery under the Medicaid and Medi-Cal Acts. Title 22 California Code of Regulations section 50960,

subdivision (b) (hereinafter Section 50960), provides that "[f]or individuals who die on or after October 1, 1993, and for payments made on or after October 1, 1993, 'estate' is defined as all real and personal property and other assets in which the individual had any legal title or interest at the time of death (to the extent of such interest), including assets conveyed to a dependent, survivor, heir or assignee of the deceased individual through joint tenancy, tenancy in common, survivorship, life estate, living trust, or other arrangement."[5] (§ 50960, subd. (b)(1).) The primary authority DHS cites for this regulation is the Medicaid Act; specifically, 42 United States Code section 1396(b). However, although the term "other arrangement" is utilized in the Medicaid Act and a DHS regulation which implements the Medicaid Act, neither contains any definition.

▮▮▮ Appellants claim that Section 50960 inadequately defines the scope of the estate against which DHS seeks recovery. Specifically, they contend that this regulation does not disclose DHS policies and procedures regarding two types of estate assets, annuities and life estates, which policies and procedures are set forth instead in underground regulations not promulgated in accordance with the APA.

DHS argues that additional regulations are unnecessary because Section 50960 makes it clear that whatever form estate assets may take, recovery will be sought only against those assets "in which the individual had any legal title or interest at the time of death" (§ 50960, subd. (b)) and "DHS only enforces claims against life estates in which the Medi-Cal recipient had a legal interest at the time of death." DHS maintains, in effect, that the portion of the regulation defining "estate" as "all real and personal property and other assets in which the individual had any legal title or interest at the time of death (to the extent of such interest)" is in and of itself sufficient, and the remainder ("including assets conveyed to a dependent, survivor, heir or assignee of the deceased individual through joint tenancy, tenancy in common, survivorship, life estate, living trust, or other arrangement") may be seen as surplusage as it merely provides a nonexclusive list of examples of assets in which the individual may have had legal title or interest at the time of death. We reject this view.

As will be seen, DHS's view of the sufficiency and clarity of its regulation defining the scope of the "estate" subject to recovery is untenable. A

---

[5]For individuals who died prior to October 1, 1993, "estate" is defined "according to the common law," and "includes property which passes from a decedent to his or her heirs by way of a revocable inter vivos trust." (§ 50960, subd. (b)(2); see also *Belshe v. Hope* (1995) 33 Cal.App.4th 161 [38 Cal.Rptr.2d 917].)

plethora of internal directives and informal memoranda provide important information pertaining to recovery policies and procedures not set forth in that regulation or in the estate recovery statutes. Uncontradicted evidence submitted by appellants shows that these policies apply generally and interpret and make certain the nature of the "estate" subject to recovery under the Medicaid Act, and are therefore "regulations" subject to the APA. For this reason, *and regardless whether such "regulations" can be deemed "necessary,"* DHS has failed to negate a necessary element of appellants' case or demonstrate that there is no material issue of fact to be tried.

DHS's plangent claim that its policy on annuities (and other policies that are also at issue) are "unnecessary"—which is perhaps the central theme of its position in this case—is entirely beside the point. Appellants have never argued, and need not show, that the DHS policies it claims must be subjected to rulemaking under the APA are "regulations" because they are necessary, because the APA does not exempt regulations that are unnecessary. It is true that the APA is inapplicable to a regulation that "embodies the only legally tenable interpretation of a provision of law" (Gov. Code, § 11340.9, subd. (f)), but DHS has never relied upon or even cited that statute or made that argument; nor, as will be seen, could such an argument succeed.

*Annuities*

Pamela McBroom, formerly chief of the ERU, testified at deposition that she felt DHS estate recovery policies were unclear in several respects and needed to be "clarified," though she was not sure whether "my bosses necessarily agree with me." In her view, annuities could constitute "other arrangements" recoverable under the Medicaid Act, but she acknowledged that the factors that made annuities and life estates recoverable were not set forth in any DHS regulation.

Stan Rosenstein, Assistant Deputy Director of DHS, who was also deposed, testified that he possessed authority to decide whether an annuity could be subject to recovery as an "other arrangement" within the meaning of the Medicaid Act. Rosenstein indicated that DHS had treated annuities as recoverable in the past but that, at an unidentified point in time, "I made the decision to stop the collection of annuities and to refund the money we had collected on annuities and gave instructions to staff not to collect again on annuities again until I approved it." Rosenstein stated that his policy decision not to seek recovery against annuities was not published, that he did not know whether it was "written down anywhere," but he disseminated the

decision to his staff by way of e-mail. An internal e-mail to staff from Jerry D. Stanger, Chief of the Payment Systems Division of DHS, dated July 10, 2000, states: "Stan [Rosenstein] doesn't want to do anything [that] will open[] up collections on Annuities even though HCFA [Health Care Financing Administration, the federal agency responsible for oversight of state Medicaid programs] is putting in the permissive language in the State Medicaid Manual. We will not do anything on this but you may want to start tracking trends in the use of annuities. My guess is that if the dollar volume gets large enough, executive staff may want to re-consider."

In support of its motion for summary judgment, DHS offered the declaration of Vivian R. Auble, acting chief of the Third Party Liability Branch of DHS, which includes the ERU. She stated that in 1998 DHS asked the HCFA whether it had authority under the Medicaid Act to enforce claims against annuities as an "other arrangement." HCFA replied that DHS had such authority, but that if it decided to seek recovery against this type of asset it would have to amend the state plan HCFA that had earlier approved. However, Ms. Auble testified, instead of amending the state plan, "DHS determined simply to cease enforcing claims against annuities as an other arrangement. At the same time, it decided to refund recoveries that had been collected from such annuities. Those refunds have been made." Ms. Auble confirmed that the decision to cease enforcing claims against annuities as other arrangements, and to provide refunds, which was made by Stan Rosenstein, "represents the formal policy of the DHS."

DHS does not deny that its policy decision to exempt annuities from recovery, though generally applicable, is not disclosed in any properly promulgated regulation. It claims this policy need not be disclosed by way of regulation because pertinent federal cases "have concluded that an agency's decision to forego enforcing a regulation is discretionary and presumed immune from judicial review." ██ This principle has no application to this case, however. The unreviewability of a discretionary agency decision to forgo enforcement of a statute it administers in a particular case does not insulate from review an agency failure to promulgate regulations in the first instance where required to do so by the APA, which is not a statute that the agency administers.

*Heckler v. Chaney* (1985) 470 U.S. 821 [105 S.Ct. 1649, 84 L.Ed.2d 714], upon which DHS relies, involved a situation very different from that presented here. *Heckler* was an action by prison inmates to compel the Food and Drug Administration (FDA) to take enforcement action under the Food,

Drug, and Cosmetic Act[6] with respect to drugs used for lethal injections to carry out the death penalty. Denying relief, the Supreme Court held that the federal APA creates a presumption of unreviewability of discretionary agency decisions not to institute enforcement actions in specific cases (5 U.S.C. § 701(a)(2)),[7] and that the presumption had not been overcome by the plaintiffs in that case. Significantly, *Heckler* was an action to enforce a statute relating to a matter (drugs appropriate for a particular use) about which the agency possessed expertise and discretion entitled to judicial deference. The present action does not similarly seek to compel DHS to enforce an estate recovery policy in a particular case, but alleges instead that a generally applicable estate recovery policy constitutes a regulation within the meaning of the APA, and must therefore comply with the rulemaking requirements of that act. *Heckler* does not in any way suggest that the FDA has expertise regarding application of the federal APA to which courts must defer.

 ██ █ DHS concedes that appellants "may have had an argument that the DHS was relying on underground regulations years ago when it was enforcing claims against annuities," but claims they can no longer make this argument "because it is uncontested that the DHS ceased the practice . . . ."[8] In support of the proposition that rulemaking requirements become inapplicable "[w]hen an agency stops engaging in conduct for which

---

[6]Title 21 United States Code section 301 et seq.

[7]Title 5 United States Code section 701(a) provides that the chapter of the federal APA on judicial review At oral argument, DHS conceded that it recently resumed its former practice of enforcing "applies, according to the provisions thereof, except to the extent that—[¶] (1) statutes preclude judicial review; or [¶] (2) *agency action is committed to agency discretion by law*." (Italics added.) DHS does not identify any counterpart provision of the California APA.

[8]On July 23, 2002, after this appeal was fully briefed, appellants filed a request that we take judicial notice of an "All County Letter" (ACL) sent by DHS to county welfare directors and other local officials on June 18, 2002 (also after this appeal became fully briefed), the purpose of which was to "provide counties with current information regarding [DHS's] ER [estate recovery] Program." The ACL defines new estate recovery policies relating to the recoverability of in-home supportive services (IHSS), the imposition of voluntary liens, death liens, disability exemptions, and hardship waivers, matters that are discussed later in this opinion, and also states that "[r]egulations are being drafted to specify what 'other arrangement' includes, *which, at a minimum, will include annuities*." (Italics added.)

The ACL is an official act of an executive department that is not reasonably subject to dispute and is capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy, and notice could therefore be taken under Evidence Code section 452, subdivisions (c) and (h), and section 459, subdivision (a). Moreover, although DHS initially opposed the motion asking us to take judicial notice of the ACL, its counsel withdrew that opposition at oral argument.

We remain cognizant, however, that on an appeal from the granting of summary judgment, "[t]he appellate court will consider only those facts that were before the trial court, and will disregard any new factual allegations on appeal." Facts not presented below cannot create a

a regulation was arguably required," DHS relies upon *Robinson v. Washington* (D.C. 1968) 302 F.Supp. 842. *Robinson* was a class action for declaratory and injunctive relief in connection with the administration by the District of Columbia Department of Welfare of the Aid to Families with Dependent Children Act (AFDC). A handbook promulgated by the department of welfare declared ineligible for assistance any mother of dependent minor children who was maintaining a continuing relationship with a man who, under the regulations, might be considered a "substitute parent." The plaintiffs were notified that AFDC payments to them and their children were terminated for failure to meet eligibility requirements under the "substitute parent" rule set forth in the handbook. The court found that the "substitute parent" rule was a "regulation," but was never adopted in the manner required by law. However, during the pendency of the suit the United States Supreme Court ruled in *King v. Smith* (1968) 392 U.S. 309 [88 S.Ct. 2128, 20 L.Ed.2d 1118] that a similar "substitute parent" rule promulgated by the State of Alabama was inconsistent with the Federal Social Security Act, and the District of Columbia Department of Welfare ceased using the "substitute parent" rule in determining AFDC eligibility. The department of welfare not only waived the repayment of sums due by reason of violations of the rule but authorized corrective payments retroactively to the date a claimant was ·incorrectly denied AFDC payments, as had been authorized by the United States Department of Health and Welfare. In light of the foregoing, the court declared that, although the "substitute parent" rule was a "regulation" that was invalidly promulgated, "it is not necessary or appropriate to grant extraordinary injunctive relief against the District of Columbia Department of Welfare as to activities no longer being pursued." (*Robinson v. Washington, supra,* 302 F.Supp. at p. 844.) The difference between the *Robinson* case and this one is that the "substitute parent" rule would have been invalid *even if it had been promulgated properly,* because it was fundamentally inconsistent with the Social Security Act. According to the undisputed testimony of Vivian Auble, the federal and state estate recovery statutes grant DHS discretion to either exempt annuities from estate recovery or to seek recovery against such assets. Nothing in *Robinson v. Washington,* or any other case of which we are aware, suggests that a policy interpreting or implementing a statute is exempt from otherwise applicable rulemaking requirements simply because the policy is to decline to impose an exaction that could validly be imposed.

"triable issue" on appeal. (*Havstad v. Fidelity National Title Ins. Co.* (1997) 58 Cal.App.4th 654, 661 [68 Cal.Rptr.2d 487]; *Sacks v. FSR Brokerage, Inc.* (1992) 7 Cal.App.4th 950, 962 [9 Cal.Rptr.2d 306].) As stated in *Uriarte v. United States Pipe & Foundry Co.* (1996) 51 Cal.App.4th 780, 791[59 Cal.Rptr.2d 332], "[w]hether summary judgment is appropriate in light of a significant new factual development in any case is an issue that should first be presented to the trial court and not to an appellate court." Because the ACL was not before the trial court, we decline to take judicial notice, as requested, and the ACL is in no measure a basis of our reversal of summary judgment.

DHS's argument that its exemption of annuities from recovery does not "implement, interpret, or make specific" the estate recovery laws it administers, and is therefore not a "regulation" within the meaning of the APA, because the policy is merely "a resolution not to enforce a regulation," is specious. The APA states it is "applicable to the exercise of any quasi-legislative power conferred by a statute." (Gov. Code, § 11346, subd. (a).) ■ Quasi-legislative powers consist in the authority to make rules and regulations having the force of law. They are essentially legislative in character but are not within the legislative power or function as constitutionally defined. ■ DHS has been delegated the authority to make rules and regulations that have the force of law relating to the recoverability of annuities (and other assets) and acknowledges it has exercised that authority by exempting annuities from recovery. Such a policy must be promulgated in accordance with the APA. Whether the adoption of regulations constitutes quasi-legislative action does not depend upon the nature of the policy embodied in the regulations. (See *Carmel Valley Fire Protection Dist. v. State of California* (2001) 25 Cal.4th 287, 299 [105 Cal.Rptr.2d 636, 20 P.3d 533]; *Friends of Sierra Madre v. City of Sierra Madre* (2001) 25 Cal.4th 165, 196 [105 Cal.Rptr.2d 214, 19 P.3d 567].) DHS's argument that "refraining from taking action is not legislation" and therefore not quasi-legislation, and, as a result, not "regulation," is based on a dictionary definition of "legislation" as "the action of making or giving *positive* law in written form . . . ." (Garner, A Dict. of Modern Legal Usage (2d ed. 1995), italics added by DHS.) The obvious error in this argument is the false assumption that a hypothetical statute exempting an asset from the imposition of an exactment could fairly be characterized as "refraining from taking action." Such a measure would represent legislative action and constitute positive law. ■ Similarly, the discretionary administrative adoption of a generally applicable rule having the same result, which implements and makes specific a law administered by the agency, constitutes "the exercise of a quasi-legislative power conferred by statute" within the meaning of the APA.

■ DHS's related argument that annuities "plainly fall within the category of an 'other arrangement' under the existing regulation, [but] DHS's discretionary choice to forego enforcing claims against them does not interpret the regulation otherwise" is simply absurd. A policy decision to exempt a particular asset from estate recovery is as interpretative of the regulation granting the agency the discretionary authority to do so as a decision not to exempt that asset. The indulgent nature of the discretionary decision to exempt does not constitute a refusal to enforce the regulation, but a decision to enforce it in a particular way.

The trial court's conclusion that DHS's policy not to enforce claims against annuities as an "other arrangement" does not constitute a "regulation" within the meaning of the APA because "regulatory elaboration is

unnecessary regarding . . . activities in which the DHS does not engage," is erroneous as a matter of law and does not support the grant of summary judgment.

*Life Estates*

Whether DHS has a policy regarding life estates which, like that relating to annuities, is also inconsistent with or goes beyond that set forth in Section 50960, so that an additional regulation must be promulgated, presents a more complex question.

Unlike annuities, which are not explicitly mentioned either in the federal and state estate recovery statutes or in Section 50960, but may be treated as "other arrangements" recoverable under the Medicaid Act and Section 50960, life estates are specifically included in the definition of estate assets made recoverable by the Medicaid Act at the option of the states. Under the Medicaid Act, the "estate" subject to recovery "shall include all real and personal property and other assets included within the individual's estate, as defined for purposes of State probate law; and [¶] [with a specified exception] . . . may include, at the option of the State . . . any other real and personal property and other assets in which the individual had any legal title or interest at the time of death (to the extent of such interest), including such assets conveyed to a survivor, heir, or assign of the deceased individual through [a] . . . life estate. . . ." (42 U.S.C. § 1396p(b)(4)(A), (B).)

DHS has never claimed life estates are necessarily included within an individual's estate under California's probate law. Its position is that whether a particular life estate is recoverable turns on whether the Medi-Cal beneficiary had legal title or interest in the asset at the time of death, a principle clear in the federal statute and not in need of state regulatory embellishment.

The only reference to life estates in DHS's published estate recovery regulations does little more than reiterate the federal statutory language quoted above, which was added to the Medicaid Act in 1993: "For individuals who die on or after October 1, 1993, and for payments made on or after October 1, 1993, 'estate' is defined as all real and personal property and other assets in which the individual had any legal title or interest at the time of death . . . including assets conveyed to a dependent, survivor, heir or assignee of the deceased individual through [a] . . . life estate . . . ." (§ 50960, subd. (b)(1).)

DHS maintains that the clarity of this statement eliminates the need for any further regulatory explanation. According to the department, when it

enforces a claim against a Medi-Cal recipient's reversionary interest in an asset "it is not enforcing a claim against a life estate, but is rather enforcing a claim against an asset included in the Medi-Cal recipient's estate," and "[t]here is nothing untoward about enforcing a claim against such an asset and additional regulations are unnecessary to authorize it."

The argument that the statutory language is, in effect, self-explanatory (which is another way of saying that an interpretive regulation is "unnecessary") ignores not just the extraordinary complexity that may attend the determination whether an individual's interest in a life estate falls within the "estate" subject to recovery under the Medicaid Act (see, e.g., *Belshe v. Hope, supra,* 33 Cal.App.4th 161), but the thrust of appellants' claim. Appellants do not argue that the substance of DHS's allegedly underground policy regarding life estates is improper; they argue only that DHS has such a policy, and that it goes beyond that described in its published regulation and amounts to an additional "regulation" within the meaning of the APA. Appellants point, for example, to ERUP No. 004-96 (rev. Apr. 9, 1999), entitled "Life Estates," which states that DHS "has made the decision to not pursue collections against certain life estates (at this time), however, we still want to review the life estate documents [because] . . . [i]f . . . our Medi-Cal beneficiary did have an ownership interest in the real property, at the time of their [*sic*] death, and willed or otherwise left the property to another party (or parties) reserving the right to a life estate for another individual (or individuals), then we may have a right to claim against the real property." The ERUP provides the following example: "if our Medi-Cal client was a man, who wanted to leave his home to his children, but set up a life estate so that his sister could live in the home for the remainder of her life, we would handle this case as any normal collection case. Our ultimate collection, however, may not occur until after the death of the life tenant." The ERUP states that, after copies of life estate documents are received and forwarded for review to a "collection representative," or "rep," "[t]he rep will make the determination as to whether or not our decedent was the recipient of the life estate (in which case we would not assert a claim, at this time) or if our decedent owned property in which he/she granted a life estate to someone else, upon his/her death (in which case we may have a right to claim). In addition, if the decedent grants themselves [*sic*] a life estate, but also retains the right to revoke, encumber, sell, collect rents, etc., the Department is pursuing our claim."

Although ERUP No. 004-96 questionably suggests DHS could pursue a claim against a life estate a Medi-Cal beneficiary received from another, its precise meaning is impossible to confidently discern from its confusing text. Indeed, the ERUP explicitly acknowledges it may be incomprehensible. The

last sentence advises DHS staff to which it was circulated that "[i]f this is still confusing to you, please let your supervisor know, so that any necessary changes can be made to clarify this issue."

The record does not disclose that any members of the ERU ever sought clarification, but it does disclose the meaning attributed to ERUP No. 004-96 by the DHS personnel to whom it was directed. Cenia Rice, a senior member of the ERU, testified at deposition that she received this ERUP in the form of an e-mail, that it represents current DHS policy regarding life estates, and that she understood it to mean "[t]hat we have the right to collect against life estates but we weren't doing it at the time." Ms. Rice stated that when she received information that a deceased Medi-Cal recipient "had some involvement with a life estate," she reviewed any relevant document provided and, if it showed that "the decedent owned a life estate, then I would pursue any other assets that the [decedent] may have other than the life estate."

The lack of clarity in DHS's informal enforcement policies pertaining to estate recovery, which permits DHS employees to conclude that life estates are generally not recoverable—because, as stated in ERUP No. 004-96, DHS "has made the decision to not pursue collections against certain life estates (at this time)"—has been criticized by the HCFA. In 1999, the HCFA conducted a review and issued a report making clear the impropriety of DHS's dependence upon policies and procedures set forth only in informal internal memoranda: "Given the impact that estate recovery has on the public at large, the current use of ERUPs is inappropriate. To be consistent with . . . the [Medicaid] Act, it is important that the process be open to the public. Including estate recovery policy in the State's standard rule-making process will allow for public comment, force greater clarity of the policies, and expand the public's awareness of a program which may someday determine the rightful ownership of their property." The HCFA report specifically adverted to ERUP No. 004-96. Noting its ambiguities ("The document states that the Department will not pursue collections against certain life estates, but then goes on to suggest that it might in the future, and that under certain conditions it might collect against life estates at this time"), the HCFA pointed out that the type of rulemaking process mandated by the APA would have resulted in a much clearer statement of DHS policy.

In response to the HCFA, DHS stated that it had developed ERUP's "as standardized inner-office operational instructions to [estate recovery] staff to ensure consistency of tasks and procedures," and that they were merely "intended as a temporary e-mail method to instruct staff until formal operations could be finalized." DHS agreed that it would review existing

ERUP's "for accuracy" and that "[i]n the future we will ensure that ERUPs strictly advise staff on [estate recovery] operational procedures and do not express [estate recovery] program policy." The HCFA was unwilling to accept this response to its "recommendation," which it said "will remain open until the State promulgates estate recovery policy that has (or is having) a direct impact on the public via its regulatory process; a process which is open to the public and susceptible to review and comment."

The evidence that, on the authority of ERUP No. 004-96, DHS employees generally do not seek estate recovery against life estates, conflicts with DHS's assertion that this ERUP is not subject to the APA because it "relates only to the internal management of the state agency." (Gov. Code, § 11340.9, subd. (d).) Nor is the APA inapplicable because the ERUP "embodies the only legally tenable interpretation of a provision of law." (Gov. Code, § 11340.9, subd. (f).)

The trial court's finding, as a matter of undisputed fact, that DHS claims for recovery against certain types of life estate arrangements but not against others "are not based on underground regulations," but merely "on legal distinctions as to what qualifies as part of the Medi-Cal recipient's estate as defined by law," is factually contradicted by record evidence. Accordingly, the grant of summary judgment on that ground was erroneous.

2. *Policies as to Whether Disabled Persons Are Exempt from Estate Recovery.*

 DHS claimed, and the trial court agreed, that because exemptions from recovery, such as those applicable to disabled persons, are specified by comprehensive federal statutes and regulations that are fully informative, "additional state regulations [on this subject] are unnecessary." This judicial determination is confusing because, as we have said, the question presented is not whether state regulations are "necessary" but whether, as appellants claim, DHS has generally applicable policies interpreting and implementing the federal statutes and regulations relating to disability exemptions, and that such policies amount to "regulations" within the meaning of the APA though they were not promulgated in accordance with the APA.

As material, the Medicaid Act provides that recovery may be sought against the estate of a deceased Medi-Cal beneficiary "only after the death of the individual's surviving spouse, if any, and only at a time . . . [¶] . . . when he has no surviving child who is under age 21, or . . . is blind or disabled as defined in section 1382c of this title . . . ." (42 U.S.C. § 1396p(b)(2).) Section 1382c of title 42 of the United States Code, the

Medicaid Act, which is part of the federal Social Security Act, provides in pertinent part that an adult "shall be considered to be disabled . . . if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." (42 U.S.C. § 1382c(a)(3)(A).) The Medicaid Act provides, finally, that "[t]he Commissioner of Social Security shall by regulations prescribe the criteria for determining when services performed or earnings derived from services demonstrate an individual's ability to engage in substantial gainful activity." (42 U.S.C. § 1382c(a)(3)(E).) The federal disability exemption is incorporated into the state Medi-Cal Act, which states that DHS may not claim recovery where there is "[a] surviving child who is blind or permanently and totally disabled, within the meaning of Section 1614 of the federal Social Security Act (42 U.S.C.A. Sec. 1382c)." (Welf. & Inst. Code, § 14009.5, subd. (b)(2)(C).) ■ These laws do not prevent the state from seeking any recovery from such estates, but only the "proportionate share" of the estate left to the person entitled to a disability exemption. (*Dalzin v. Belshe* (N.D.Cal. 1997) 993 F.Supp. 732.)

Assistant Deputy Director Rosenstein testified that after a 1999 HCFA report criticizing the "criteria and methodology" DHS used in making disability determinations, DHS decided to cease making disability evaluations and to transfer this responsibility to the California Department of Social Services (DSS) under contract. Members of the ERU testified that an applicant for an exemption from recovery is at present considered disabled if he or she has been deemed disabled for purposes of the federal Supplemental Security Income Program (SSI), or the person is not receiving SSI but has been determined by the DSS to be disabled under federal standards. DHS advised the trial court that it began referring disability claims for which there were no SSI determinations to DSS in 2001 under an interagency agreement and "has no plans to reinstitute its prior practice of making its own determination of a person's disability for purposes of the disability exemption."

DHS's argument that it has no responsibility to promulgate regulations relating to the process for determining disability does not rest on its transfer of decisionmaking responsibility to DSS. Indeed, the interagency agreement between DHS and DSS makes it clear that ultimate responsibility remains with DHS. The chief purpose of the agreement was to impose on DSS the responsibility to "[r]eview proposed changes in [disability evaluation] policies and procedures and [to] implement those *adopted by DHS*." (Italics added.) The agreement explicitly acknowledges that "DHS is responsible for ensuring compliance with Federal and State regulations/statutes" relating to

estate recovery and that, in "[r]eceiv[ing] and process[ing] referrals of pending disability claims," DSS must "[a]bide by and implement, *as directed by DHS*, all federal and state statutes, regulations, program policies, and court directives concerning the disability evaluation process and related services." (Italics added.) Significantly, the agreement also explicitly acknowledges that after obtaining "input" and "recommendations" from DSS, DHS must "adopt regulations, policies, and procedures as needed (related to the disability evaluation function) which are consistent with [federal] standards."

 DHS now repudiates this responsibility, claiming it is "unnecessary" for it to adopt "regulations, policies and procedures" relating to the "disability evaluation function" due to the alleged adequacy of the federal law and regulations on the subject. According to DHS, the regulations are "clear and obligatory, and the DHS has ensured that these standards are being applied." Because DHS believed the comprehensive federal rules on disability determinations require no interpretation and cannot be made any more specific than they already are, the regulations it promulgated pursuant to the APA have little to say on the subject. The sole reference to disability in the published regulations is the conclusionary statement that DHS may not make a claim for recovery "where there is a surviving child who is blind, or disabled, within the meaning of Section 1614 of the Federal Social Security Act (42 USC Section 1382c)" (Cal. Code Regs., tit. 22., § 50961, subd. (d).), which simply tracks identical language in the state Medi-Cal Act. (Welf. & Inst. Code, § 14009.5, subd. (b)(2)(C).)

The trial court's agreement with DHS that "additional state regulations [relating to disability determinations] are unnecessary," implies the finding that, as DHS claims, the disability provisions of the Medicaid Act and the federal regulations are not in need of interpretation and are self-executing. We disagree, but consider the issue beside the point. As will be seen, DHS has a generally applicable policy interpreting and implementing the federal statute and regulations, and for purposes of deciding whether it constitutes a regulation within the meaning of the APA it is irrelevant whether they are necessary.

The federal regulations relating to disability determinations under the Medicaid Act, which are extraordinarily lengthy and complex,[9] describe in

---

[9]The federal regulations are set forth in chapter III, part 416, subparts I and J, of title 20 of the Code of Federal Regulations, which consist of 193 separate sections (§§ 416.901-416.1094) comprising 114 pages in the Federal Register.

detail the disability criteria and methodology applicable to disability determinations made by the Social Security Administration (SSA) at the federal level, which state agencies making such determinations must also employ. However, the policies appellants are concerned about are not those defining the evidence that may be considered in evaluating disability claims—the federal regulations expansively state that "[e]vidence is *anything* you or anyone else submits to us or that we obtain *that relates to your claim*" (20 C.F.R. § 416.912(b) (2002), italics added)[10]—but a policy indicating that DHS employs a specific evidentiary test that decisively determines whether a claimant meets the standard of disability set forth in the Medicaid Act. DHS identifies no federal regulation, and we are not aware of one, providing this information.

---

[10]Accordingly, the range of acceptable types of evidence the disability decision maker may consider is extremely broad. It "includes, but is not limited to: [¶] (1) Objective medical evidence, that is medical signs and laboratory findings . . . ; [¶] (2) Other evidence from medical sources, such as medical history, opinions, and statements about treatment you have received; [¶] (3) Statements you or others make about your impairment(s), your restrictions, your daily activities, your efforts to work, or any other relevant statements you make to medical sources during the course of examination or treatment, or to us during interviews, on applications, in letters, and in testimony in our administrative proceedings; [¶] (4) Information from other sources, as described in § 416.913(d) [which includes, inter alia, nurse-practitioners, chiropractors, audiologists, school teachers, developmental center workers, daycare center workers, social welfare agency personnel, spouses, parents, and other caregivers, siblings and other relatives, friends, neighbors and clergy.]; [¶] (5) Decisions by any governmental or nongovernmental agency about whether you are disabled or blind; and [¶] (6) At the administrative law judge and Appeals Council levels, findings, other than the ultimate determination about whether you are disabled, made by State agency medical or psychological consultants and other program physicians or psychologists, and opinions expressed by medical experts we consult based on their review of the evidence in your case record." (20 C.F.R. § 416.912 (2002).)

Another federal regulation defines the "responsibility" of the disability decision maker as follows: "Before we make a determination that you are not disabled, we will develop your complete medical history for at least the 12 months preceding the month in which you file your application unless there is a reason to believe that development of an earlier period is necessary or unless you say that your disability began less than 12 months before you filed your application. We will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports. [¶] . . . *Every reasonable effort* means that we will make an initial request for evidence from your medical source and, at any time between 10 and 20 calendar days after the initial request, if the evidence has not been received, we will make one follow-up request to obtain the medical evidence necessary to make a determination." (*Id.*, § 416.912(d)(1) (2002).) This regulation absolves the disability decision maker of the responsibility to seek additional evidence or clarification from a medical source only "when we know from past experience that the source either cannot or will not provide the necessary findings." (*Id.*, § 416.912(e)(2).) The regulation provides, finally, that "[i]f the information we need is not readily available from the *records of your medical* treatment source, or we are unable to seek clarification from your medical source, we will ask you to attend one or more consultative examinations at our expense." (*Id.*, § 416.912(f).)

When asked whether, at the present time, there was "any way for someone to know in advance what they need to submit to the Department with respect to a claim of disability," Pamela McBroom, who worked in the ERU, answered "no." However, while DHS has never properly promulgated rules informing applicants of the nature of the evidence that will conclusively support an application for a disability exemption, and the agency to which the application should be directed, DHS has always had policies regarding these matters, though they have changed from time to time.

Prior to 1999, DHS required an applicant for disability exemption only to present either a document from the SSA or a county welfare agency, or a physician's letter, stating he or she was totally and permanently disabled and unable to obtain substantial gainful employment, and DHS itself made the disability determination.[11] However, an e-mail circulated on November 22, 1999, to members of the ERU directed that "we can no longer accept just a doctor's note" as dispositive evidence of disability. The policy changed again when, in 2001, DHS transferred the responsibility to evaluate and decide disability claims to DSS. With respect to the evidence considered sufficient to support a disability claim at the present time, DHS claims that "[n]ow, if an applicant for an exemption has been deemed disabled under the SSI program or by [DSS] (and has thus met the standard under [42 U.S.C.] § 1382c), the determination is considered conclusive evidence of a disability."

The foregoing guidelines are or were generally applicable policies interpreting and implementing the federal statutes and regulations relating to disability exemptions, and therefore should have been the subject of rule-making under the APA. If they had been promulgated and revised in the manner prescribed by the APA, DHS's guidelines would doubtless have been more precise and complete. For example, a policy stating that the *granting* of a disability claim under the SSI program or by DSS is "conclusive" evidence that the claimant is disabled for purposes of estate recovery

---

[11]DHS's pre-1999 policy regarding the evidence needed to sustain a disability claim was set forth in ERUP No. 008-96, which issued in 1996, was revised in 1999, and is apparently no longer followed. It stated that a document provided by SSA or a county department of social services will satisfactorily establish disability only if it explicitly states that the disability is "permanent and total," and that the claimant is "unable to engage in any substantial gainful activity." (*Ibid.*) The ERUP goes on to state that if documentation provided by SSA or a county social services department is insufficient, but the DHS employee assigned the case "*feels*" that the disability claim may nonetheless be valid, the employee "*may*" contact the claimant's physician "to seek clarification or further evidence" of disability." It is not clear from ERUP No. 008-96 whether DHS considered the many acceptable types of evidence of disability described in the federal regulations.

suggests that the *denial* of such a claim under the SSI program or by DSS may not be conclusive, and could be overruled by DHS. If so, applicants whose claims were so denied will want to know the nature of any specific evidence that must be presented in order to obtain DHS reversal of an adverse disability determination. The policy is also silent as to whether DHS (or DSS under the interagency agreement) accepts the "responsibilities" imposed by the federal regulations on disability decision makers, including the responsibility to make "every reasonable effort" to help applicants obtain medical records. (See 20 C.F.R. § 416.912(d)(1) (2002), discussed *ante*, at fn. 10.)

In any event, whether a policy constitutes a "regulation" within the meaning of the APA does not turn on whether it is as informative as it might be; it is enough that it interprets and implements a statute and is generally applicable. Because DHS has a generally applicable policy as to the evidence that decisively supports a disability claim under the estate recovery provisions of the Medicaid Act, the questionable finding of the trial court that state regulations relating to this issue are "unnecessary" is legally irrelevant and does not support the grant of summary judgment.

3. *Policies Regarding the Use of Voluntary Liens and the Allowance of Hardship Waivers.*

 Where the estate of a deceased Medi-Cal beneficiary contains no liquid assets, or the liquid assets are not adequate to satisfy a recovery claim, DHS accepts a lien on the property until the property is sold or escrow funding is available. DHS has no written policy pertaining to this practice, but the deposition testimony of members of the Estate Recovery Unit shows that they follow guidelines set forth in ERUP No. 001-99, entitled "Voluntary Liens," which circulates internally via e-mail. By its own terms, this ERUP is intended "to clarify [DHS] policy, regarding the voluntary lien process, when the debtor(s) or agent for the debtor(s) has made a request that the Department allow a repayment plan secured by a voluntary lien." (*Ibid.*) Pursuant to ERUP No. 001-99, DHS will consider acceptance of a lien only after three failed attempts by the debtor to obtain funding from a private lending institution. "Upon receiving three valid denials from financial institutions, the CR [collection representative] must request that the debtor(s) complete a financial statement. Once the documentation has been received, the CR must review the financial statement to determine if it would be in the best interest of [DHS] to accept a voluntary lien." Once DHS has determined to accept a voluntary lien as security for payment of the debt, "the CR must enter into negotiations with the debtor(s) to establish an acceptable monthly

payment arrangement. Consideration should be given to the amount of the indebtedness, interest accrual, and the financial situation of the debtor(s)." After a lien is successfully negotiated and its terms approved by the collection supervisor, the collection representative prepares appropriate lien documents insuring that interest accrues "at a rate consistent with the Revenue and Taxation Code."

Members of the ERU testified that there are situations in which interest is not charged or is deferred. There is "no written policy or practice or guideline" specifying that interest must be charged and the rate thereof, or permitting relief from the interest requirement. However, there are some unwritten "general practices" regarding these matters, several of which were disputed. Cenia Rice and Pamela McBroom both indicated that the interest DHS charged and the rate thereof were dictated by Probate Code section 9203, subdivision (b) which states that a "public entity's claim against distributees [of an estate against which the public entity has a claim] includes interest at a rate equal to that specified in Section 19521 of the Revenue and Taxation Code, from the date of distribution or the date of filing of the claim by the public entity, whichever is later . . . ."[12] Rice and McBroom testified, however, that although DHS ordinarily informs a person against whom it has a claim who has agreed to a voluntary lien that "[i]nterest starts on the date of distribution or the date of our claim, whichever is later," and charges interest at the rate by the Probate Code, DHS has a practice of not imposing interest during the processing of a hardship exception sought by that person. The relationship between the use of voluntary liens and the granting of hardship exceptions was a subject of dispute in the trial court.

The Medicaid Act requires state agencies such as DHS to establish procedures under which it shall waive estate recovery claims if recovery "would work an undue hardship as determined on the basis of criteria established by the Secretary [of Health and Human Services]." (42 U.S.C. § 1396p(b)(3).) The Medi-Cal Act similarly requires DHS to waive its claim where enforcement "would result in substantial hardship to other dependents, heirs, or survivors of the individual against whose estate the claim

---

[12]At the hearing on the motions for summary judgment, the deputy attorney general representing DHS claimed that the interest rate charged was always that "agreed upon" by the parties to the lien agreement. He emphasized that "[b]oth the lien itself and the interest that accrues is agreed upon by the debtor and the DHS. Not one lien is ever imposed by the DHS involuntarily. Not one." DHS has provided no evidence, however, that it ever entered into a voluntary lien agreement imposing interest at a rate other than that mandated by the Probate Code. Resting on the deposition testimony of DHS employees, appellants maintain that DHS has an unwritten policy regarding interest and the rate thereof which implements the Probate Code, making it specific, which amounts to a "regulation" within the meaning of the APA, but which has not been promulgated in accordance with that Act.

exists." (Welf & Inst. Code, § 14009.5, subd. (c)(1).) The DHS regulation establishing undue hardship criteria is set forth in section 50963 of title 22 of the California Code of Regulations. Subdivision (a) states that DHS "shall waive its claim, in whole or in part, if an applicant can demonstrate through submission of a written application or, if applicable, at an estate hearing, that enforcement of the Department's claim would result in an undue hardship to the applicant." (Cal. Code Regs., tit. 22, § 50963, subd. (a).) Six nonexclusive factors that may be considered in determining hardship are set forth in the regulation. Among those listed are situations in which the applicant would be eligible for public assistance if he or she were not allowed to keep the proceeds of a Medi-Cal beneficiary's estate, or if keeping the proceeds would enable the applicant to discontinue public assistance. A hardship would also result when the estate property is part of a business, including a farm or ranch, and recovery of medical assistance expenditures would result in the applicants losing their sole means of livelihood, or where aged, blind or disabled individuals living in the decedent's home for at least a year "would have difficulty obtaining financing (such as a home equity loan) to repay the State," or where the applicant transferred the property to the decedent for no consideration, or where the applicant needed equity in real property "to make the property habitable, or to acquire the necessities of life, such as food, clothing, shelter or medical care." (Cal. Code Regs., tit. 22, § 50963, subd. (a)(1)-(6).) "An undue hardship does not exist when the decedent or applicant created the hardship by using estate planning methods to divert or shelter assets in order to avoid estate recovery." (*Id.*, § 50963, subd. (b).)

Appellants claim DHS commonly uses lien offers to defeat hardship claims, and that these written and unwritten policies and practices impose additional and burdensome standards which interpret and exceed those set forth in the published regulation just described. As counsel for appellant stated below, "what DHS is doing is saying, 'we don't need to give you a hardship waiver because guess what, we can just assert a lien on your house.'" DHS strenuously denies it engages in such a practice, but the record contains evidence to the contrary.

For example, appellants introduced into evidence a DHS decision dated May 16, 2000, denying Lillie Wilson a hardship waiver of her share ($6,647) of a claim against the estate of her deceased mother. DHS determined that the value of the decedent's estate, which consisted of a share in a home Ms. Wilson and her mother held in joint tenancy and in which they lived, was $19,950, and that this amount was sufficient to satisfy the adjusted claim against the estate. Ms. Wilson and her husband, who cared for the decedent in the home for many years, had a total monthly income of $1429 from

Social Security, and Ms. Wilson's expenses exceeded her income by approximately $260 per month. Her total assets, which consisted of a savings account and two motor vehicles, were valued at $3,000. Her husband's entire Social Security income and a portion of hers was devoted to the care of the husband's son, Ms. Wilsons's stepson, who was emotionally disturbed. Because she was using savings to meet expenses exceeding her income, Ms. Wilson took the position that she qualified for a hardship waiver under a provision of the DHS regulation allowing a waiver "[w]hen equity in the real property is needed by the applicant to make the property habitable, or to acquire the necessities of life, such as food, clothing, shelter or medical care." (Cal. Code Regs., tit. 22, § 50963, subd. (a)(6).) DHS denied Ms. Wilson's request for a hardship waiver in part because "many of her expenses relate to support of her husband and to her stepson," not herself, and because the value of her interest in the property ($19,950) exceeded the claim ($6,647), so sale of the house would "still leave a residual for Ms. Wilson." However, the order denying her hardship claim indicates that the major reason was Ms. Wilson's rejection of DHS's "willingness to work with [her] to arrange a lien and/or payments on the claim." For this reason DHS concluded that Ms. Wilson had failed to demonstrate that she needed her equity in the property "to acquire the necessities of life, such as food, clothing, shelter or medical care." (Cal. Code Regs., tit. 22, § 50963, subd. (a)(6).)

Appellants' contention that DHS has a general practice of using the refusal to voluntarily agree to a lien as an improper basis upon which to deny requests for hardship waivers[13] is also supported by internal DHS e-mails, transcriptions of which were received in evidence, acknowledging that, "USUALLY, an agreement to accept a lien defeats the applicant's argument that they have a hardship . . . ." (Capitalization in original.) DHS's apparent practice of delaying hardship determinations until after an applicant had decided whether to agree to a postdeath lien, was also remarked upon by the HCFA, which indicated a concern that the practice induced lien agreements that were not genuinely voluntary. The 1999 HCFA report recommended that DHS "comply with its requirement to respond to hardship waiver applications within 90 days," and "render a decision on the hardship waiver request prior to the presentation of a post-death lien." DHS responded that it would "consider the recommendation," but the record does not show it has acceded in any way.

---

[13]The claim that this practice violates federal and state law making hardship exemptions mandatory when hardship is demonstrated, as more specifically alleged in the second claim for relief set forth in the complaint, is appellants' only claim of substantive impropriety unrelated to the APA.

Viewing the evidence in the light most favorable to appellants, as we must, we cannot agree with the trial court that "DHS's practices regarding liens and the collection of interest do not constitute an underground regulation and are not regulatory." DHS failed to produce undisputed evidence that it does not "usually" employ lien agreements to defeat applications for hardship waivers, as the record suggests. Because the evidence whether DHS has such a policy—which, if it did, would constitute a "regulation" within the meaning of the APA—is disputed, the grant of summary judgment on the ground DHS has no such policy was erroneous.

### 4. *Policies on Recovery of In-home Health Services Payments.*

As previously described, the estate recovery statutes require DHS to claim against the estate of a deceased Medi-Cal beneficiary "or against any recipient of the property of that decedent by distribution or survival an amount equal to the payments for the health care services received or the value of the property received by any recipient from the decedent by distribution or survival, whichever is less." (Welf. & Inst. Code, § 14009.5, subd. (a); see also 42 U.S.C. § 1396p(b)(1) ["the State shall seek adjustment or recovery of any medical assistance correctly paid on behalf of an individual . . ."].) The health care services received by a deceased Medi-Cal beneficiary may include IHSS provided by a family member or other persons paid to provide such services. The evidence shows that while DHS sought recovery of the federal share of such personal care payments in the past , its current practice is to exclude the value of such payments from the recovery sought. The text of a "chain e-mail" received in evidence disclosed that Assistant Deputy Director Rosenstein made the decision "to cease including IHSS services on our estate recovery claims for anyone who died 9/1/00 or after." Rosenstein made this decision after he was told by the HCFA that DHS "had no federal obligation to make that collection." Rosenstein understood that the California estate recovery statute gave DHS "permissive authority" to seek reimbursement for the federal share of IHSS payments. He testified that "[w]e were only recovering the federal share because we thought it was a federal requirement. Once the federal government said you have no obligation to collect our share of the payment, we ceased collecting it." However, although DHS does not seek recovery of IHSS payments in cases in which the Medi-Cal beneficiary died after September 1, 2000, it has not applied this policy retroactively, and after that date continued efforts to recover payments for IHSS received by Medi-Cal beneficiaries who died prior to September 1, 2000. An e-mail dated October 11, 2000, to Rosenstein from a supervisor in the ERU, stated that "[w]e have at your direction implemented the policy to exclude IHSS Personal Care costs from the

[estate recovery] claim as of 9/1/00, however, have not announced it publicly. Staff are reporting an increasing number of calls on this, we could buy some good will by announcing this policy change publicly." Rosenstein testified that DHS never provided public notification of policies regarding the recoverability of IHSS payments.

The trial court agreed with DHS's claim that its policies relating to the recoverability of IHSS payments are not "underground" regulations and do not violate the APA, stating that "undisputed facts reveal that the DHS does not enforce claims for IHSS. There are no underground regulations, and regulatory elaboration is unnecessary regarding these activities in which the DHS does not engage." This judicial statement reveals a fundamental misconception of the regulatory responsibility of an administrative agency.

The California estate recovery statute provides that DHS "*shall* claim against the estate of the decedent, or against any recipient of the property of that decedent by distribution or survival an amount equal to the payments for the health care *services received or the value of the property received by any recipient from the decedent by distribution or survival, whichever is less.*" (Welf. & Inst. Code, § 14009.5, subd. (a).) DHS interprets this statute as granting it "permissive" authority to seek recovery of payments to family members or others who provided in-home services to a deceased Medi-Cal beneficiary, and that DHS implements the state statute by exercising its discretion to forgo recovery of such payments. Assistant Deputy Director Rosenstein testified that the federal government does not "obligate" DHS to seek recovery of the "federal share" of IHSS payments, but he did not say, and we are provided no reason to believe, that DHS is legally prohibited by any federal law or regulation from seeking recovery of the "federal share," or that the federal government has any policy as to the recoverability by DHS of the "state share" of such payments. We are not called upon to decide whether, as DHS claims, it is permitted but not required to seek recovery of IHSS payments, for the argument concedes the Department has discretion to seek or to forgo recovery.

DHS's claim that the exercise of this policy discretion would constitute a regulation subject to the APA only if it resulted in a decision to seek recovery of IHSS payments, but not if it resulted in a decision to forgo recovery of such payments, is based on the same false argument it uses to avoid application of the APA to its policy regarding the recoverability of annuities. As applied to IHSS payments, respondents' argument is that "the decision not to enforce claims . . . fails to amount to an underground regulation because it does not apply generally [as required under *Tidewater*

*Marine Western, Inc. v. Bradshaw, supra*, 14 Cal.4th at p. 571]. Rather than being generally applicable, it is generally *inapplicable*[,] [and] regulations are not required to govern activity that is not occurring." (Original italics.) This dubious "logic" does not support the grant of summary judgment. As earlier explained, a discretionary policy decision not to enforce a type of claim an administrative agency has the authority to enforce is as generally applicable as a decision to enforce such a claim, and interprets and implements the law the agency administers.

### III. DISPOSITION

Appellants have produced considerable evidence showing that the departmental policies and practices at issue in this case were intended by DHS to apply generally, not simply in a specific case, and that they implement, interpret and make specific estate recovery provisions of the federal Medicaid Act and state Medi-Cal Act, which DHS administers. Because DHS has not conclusively negated appellants' claim that the policies and practices described in this opinion are "regulations" within the meaning of the APA, and has failed to demonstrate that there are no material issues of fact that require the process of trial, the trial court erred in granting summary judgment in favor of DHS.

Accordingly, the judgment is reversed and the matter remanded to the trial court for further proceedings consistent with this opinion. Appellants are awarded their costs on appeal.

Lambden, J., and Ruvolo, J., concurred.

On March 10, 2003, the opinion was modified to read as printed above.