[No. F021281. Fifth Dist. Feb. 24, 1995.]

S. KIMBERLY BELSHÉ, as Director, etc., Plaintiff and Respondent, v. LEONARD T. HOPE, JR., et al., Defendants and Appellants.

## COUNSEL

Coffill & Coffill and William J. Coffill for Defendants and Appellants.

Daniel E. Lungren, Attorney General, Charlton G. Holland III, Assistant Attorney General, Dennis Eckhart and Mateo Muñoz, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

ARDAIZ, P. J.—Plaintiff Molly Joel Coye, M.D., Director of the California Department of Health Services (hereafter Department),[1] filed (in her official capacity) a complaint against defendants Leonard T. Hope, Jr., Michael M. Hope, Warren J. Hope and Mary P. Barnthouse, seeking to recover the value of Medi-Cal benefits provided to Myrtle M. Hope, the decedent and mother of the defendants. The facts were undisputed and summary judgment was granted in favor of the Department. The defendants appeal, raising the question of law whether property passing by way of a revocable inter vivos trust is part of the estate of the decedent for purposes of recovery of Medi-Cal benefits.

### FACTS

On or about September 13, 1976, Myrtle Hope executed a revocable inter vivos trust. The trust contained a one-half interest in certain real property. Under the trust agreement, Myrtle retained the use and benefit of the property for her natural lifetime. Upon her death, the trust estate was to be delivered to her husband. If her husband predeceased her, then the trust estate was to be distributed in equal shares to her four named children, the defendants. The defendants were Myrtle's only children. Myrtle named herself as trustee and reserved unto herself the power to revoke the trust in whole or in part without giving notice and/or gaining the consent of any of

[1]Molly Joel Coye is no longer the Director of the State Department of Health.

the beneficiaries. On the same date, the grant deed was signed by Myrtle transferring the real property to the trust.

From April 1, 1987, through July 30, 1992, Myrtle was a recipient of Medi-Cal benefits totaling $294,062.26. Myrtle died on July 30, 1992. Prior to her death, Myrtle did not revoke, repudiate or modify the trust. The Department filed a preferred creditor's claim for $294,062.26 against Myrtle's estate. The claim was rejected. The Department then filed this suit.

## DISCUSSION

Under the federal Medicaid Act, 42 United States Code section 1396 et seq., the federal government will partially reimburse states that provide medical treatment to the poor. If a state decides to participate in the program, the state must enact legislation which meets various federal requirements. (42 U.S.C. § 1396a(a)(8).) California's Medicaid program, known as the "California Medical Assistance Program," or Medi-Cal, is found in the Welfare and Institutions Code at section 14000 et seq.

The federal statutes provided that the state may seek reimbursement, under certain circumstances, from the "estate" of the recipient of benefits. (42 U.S.C. § 1396p(b)(1)(B).) At the time of Myrtle's death, the term "estate" was not defined in the federal statute.[2] Welfare and Institutions Code section 14009.5 is the California statute which allows the Department to make a claim against the estate of a decedent.[3]

The defendants alleged below that the property which they acquired was not within the estate of Myrtle when she died and is therefore exempt from any claim by the Department. The Department asserted alternative grounds for recovery of the property. First, the Department contended that property which passes by way of a revocable inter vivos trust is considered to be within the estate for purposes of Welfare and Institutions Code section 14009.5. Second, the Department asserted that the property which passed by trust remained in the estate because the trust document was testamentary in nature. The third theory argued by the Department was that under the common law the trust property would pass by way of descent through the estate.

The trial court found in favor of the Department on all three bases. Each basis was found by the trial court to be a separate, alternative, and independent basis. First, the trial court found that property which passes from a

---

[2]The statute was amended October 1, 1993, and now includes a definition of the term "estate."

[3]This code section was amended effective June 30, 1993. The amendments do not apply to the issue in this case.

decedent to her heirs by way of a revocable inter vivos trust is within the "estate" for purposes of Welfare and Institutions Code section 14009.5. Second, the trial court found that the trust was testamentary in nature and therefore remained in Myrtle's estate at the time of her death. The court found that the reservation of a life estate, combined with the power to revoke and control the trust, rendered the trust invalid. Finally, the trial court found that Myrtle's intent was to benefit her heirs and, under the common law, the acquisition of the property by defendants was by way of descent.

Defendants' appeal makes the same three arguments which were made below. Because the facts are undisputed, the issues raised are purely questions of law that must be determined independently by this court.

The trial court relied on *Demartini v. Allegretti* (1905) 146 Cal. 214 [79 P. 871] in finding that the inter vivos trust was testamentary in nature and was part of the estate. In 1895 Geralomo Demartini gave money to two individuals, G. Allegretti and G. B. Demartini (hereafter referred to as Allegretti) to invest for him. In 1896 he executed a document directing Allegretti how to dispose of the money on his death. Demartini died in 1902. Between 1896 and the time of his death, Allegretti gave Demartini "whatever of the money he wanted." (*Id.* at p. 216.) The administrator of Demartini's estate sought to recover the funds for the estate; others named in the instruments as the proposed recipients of the funds (appellants) sought to recover the money by virtue of the 1896 written instrument, claiming the instrument vested in them a present interest. (*Id.* at pp. 215-217.) The trial court found that the money belonged to the estate. The Supreme Court found that the written document was testamentary.

"[L]ooking alone at the instrument in question there is nothing to be seen in it which gives to appellants any present vested interest or estate in the property in contest. It merely gives direction to Allegretti and G. B. Demartini that, in the event of the death of the deceased, they shall then give whatever of his money they may still have in their hands to the appellants. Nothing is given them before the event of his death. This direction had no effect before his death, and it could not have effect after that event, for a disposition of property to take effect after death can be made only by an instrument executed in accordance with the statute of wills. The instrument from beginning to end is, on its face, clearly and entirely testamentary in character." (*Demartini v. Allegretti, supra,* 146 Cal. at p. 218.)

The Department claims that *Demartini* is dispositive and stands for the proposition that "retention of excessive control by the settlor of a trust invalidates the trust as the settlor is deemed not to have parted with present

interest in the trust property." The Supreme Court in *Demartini* was not determining if a trust was valid; the court was determining if the document was a trust document or a testamentary document. The document contained no express language naming it as one or the other. The court in *Demartini* determined that the instrument was a directive letter telling Allegretti what to do with the property on his death and was therefore testamentary in character and had to comply with the statute of wills.

The Department asserts that *Tennant* v. *John Tennant Memorial Home* (1914) 167 Cal. 570 [140 P. 242], the case relied on by the heirs, is not on point because it "does not examine the issue of extensive control retained by a settlor of a trust, but rather holds that in order for a trust in land to be created a present interest in the property must pass from the settlor." The Department mischaracterizes *Tennant*.

In *Tennant*, Margaret Tennant executed a deed purporting to grant real property to the defendant, John Tennant Memorial Home, " '[S]ubject to the exceptions and reservations.' " (*Tennant* v. *John Tennant Memorial Home*, *supra*, 167 Cal. at p. 571.) The exceptions and reservations in the deed were as follows: " 'Excepting, however, and reserving to said grantor the exclusive possession and the use and enjoyment in her own right, of the rents, issues and profits of said lots and each of them for and during the term of her natural life.

" 'And further reserving to the said grantor the right to revoke this deed as to the said property above described or as to any portion thereof, and further reserving to her, the said grantor, the right during her natural life to sell any of the above described property, and to sign and execute deeds therefor in her own individual name and to convey by any such deed a full, perfect and absolute title thereto to the purchaser thereof, and with right to use the proceeds arising from such sale or sales to her own use, without any liability for her or her estate to account therefor. In case of such revocation being made, it shall be made and can only be made in writing, duly acknowledged and recorded.' " (*Tennant* v. *John Tennant Memorial Home*, *supra*, 167 Cal. at p. 572.)

Margaret died, and during her lifetime did not revoke, sell or otherwise convey the property as allowed by the written reservations in the deed. After Margaret's death, her heirs claimed the deed was void and sought relief. The trial court gave judgment to the defendant, John Tennant Memorial Home. (167 Cal. at pp. 571-572.)

On appeal, following a lengthy discussion of the common law, the Supreme Court rejected the heirs' claim that the deed was void because

Margaret inserted a reservation of power to revoke the deed. The court held that the law does not forbid such a reservation. The Supreme Court found that Margaret reserved a life estate and therefore the deed transferred at once a vested future interest. Although Margaret created and granted a vested future interest by deed, she was authorized to provide in the deed creating the future interest, for the defeat of such interest. She did so by reserving the power of revocation. (167 Cal. at pp. 574-575.) Such reservations in a deed creating a trust are valid. (*Id.* at p. 576.)

The heirs in *Tennant* continued their argument by asserting that the deed was "not a present grant of property, so far as the remainder is concerned, but is an instrument testamentary in character and therefore invalid as a disposition of the property, because it is not executed with the formalities necessary to the execution of a will." (167 Cal. at p. 577.) The Supreme Court set forth the rules to determine if an instrument is testamentary in nature.

" 'The essential characteristic of an instrument testamentary in its nature is, that it operates only upon and by reason of the death of the maker. Up to that time it is ambulatory. By its execution the maker has parted with no rights and divested himself of no modicum of his estate, and *per contra* no rights have accrued to and no estate has vested in any other person. The death of the maker establishes for the first time the character of the instrument. It at once ceases to be ambulatory, it acquires a fixed *status* and operates as a conveyance of title. Its admission to probate is merely a judicial declaration of that *status.* On the other hand, to the creation of a valid express trust it is essential that some estate or interest should be conveyed to the trustee, and, when the instrument creating the trust is other than a will, that estate or interest must pass immediately. By such a trust, therefore, something of the settlor's interest has passed from him and into the trustee for the benefit of the *cestui*, and this transfer of interest is a present one and in nowise dependent upon the settlor's death. But it is important to note the distinction between the interest transferred and the enjoyment of that interest. The enjoyment of the *cestui* may be made to commence in the future and to depend for its commencement upon the termination of an existing life or lives of an intermediate estate.' " (*Tennant v. John Tennant Memorial Home, supra*, 167 Cal. at pp. 577-578.)

The Supreme Court held that the interest was transferred when the trust was created, even though it would not come into possession until the grantor's death. The court also held that the reserved power to revoke the deed "is of no consequence in the argument upon the question whether it is or is not testamentary. The power of revocation being valid, its exercise

would at once revest the title in the grantor and she would then have absolute power to dispose of it by deed or otherwise. . . . The reservation of the power to revoke did not operate to destroy, or in anywise restrict the effect of the deed as a present conveyance of a future vested interest. It merely afforded the means whereby such vested future estate could be defeated and divested before it ripened into an estate in possession." (*Tennant* v. *John Tennant Memorial Home, supra,* 167 Cal. at p. 578.)

The Supreme Court also rejected the argument that the document was testamentary because the disposition of the property was substantially the same as Margaret might have made by will.

"An instrument is declared to be testamentary in nature only when, and because, it appears from its terms that the intention of the maker thereof was that it should not be operative as a conveyance or disposition of the property, or of any interest, present or future, therein, until his death. This is always essential. If the instrument, according to its proper legal effect under the rules of conveyancing, passes at the time of its execution a present interest or title in the property to a third person, although it may be only an interest in a future estate and may be subject to defeat on the happening or nonoccurrence of a future event, it is a present conveyance and not a will. We do not think the fact that if the grantor had not at that time made this deed, but instead had made her will giving this property to the respondent, she would then have continued to enjoy the property until her death, in the same manner and as fully as she did thereafter enjoy it by reason of her reservation in the deed of an estate therein during her life, constitutes a reason for holding the deed to be a testamentary disposition. Notwithstanding these reservations and this privilege of enjoyment, she did then, in fact and in law, convey to the grantee the future estate which, at her death, became an estate in possession, to said grantee." (*Tennant* v. *John Tennant Memorial Home, supra,* 167 Cal. at p. 579.)

Thus, *Tennant* holds exactly the opposite of what Department asserts it holds. *Tennant* holds that a trust such as the one here transfers a present interest at its creation. It further holds that the grantor can reserve powers of revocation without invalidating the trust. (See *Osborn* v. *Osborn* (1954) 42 Cal.2d 358, 365 [267 P.2d 333], quoting *Tennant* with approval.)

The above authorities demonstrate that the trust created by Myrtle Hope is a valid trust and is not a testamentary document.

The Department also argues that because the heirs were not vested with a present interest prior to Myrtle's death, the heirs took their property through

Myrtle's estate. The Department again mischaracterizes language in *Tennant* and ignores its express finding rejecting the same argument made by the Department here and holding that the deed transferred a present interest in the remainder. (167 Cal. at pp. 577-579.)

The Department relies on the case of *Noble* v. *Learned* (1908) 153 Cal. 245 [94 P. 1047] to support its position. Its statements of the holding in *Noble* again take the court's holding completely out of context.

In *Noble* v. *Learned*, Mrs. Lee wanted to invest her money so she could derive income from it, use it if she wanted to, and be able to designate how it should be distributed upon her death. She invested her money in stock certificates. After doing so, she signed the back of each certificate with an endorsement purporting to transfer the shares to different persons, including Gennis Learned. Mrs. Lee gave the certificates and passbooks to Noble, telling him that if she did not get well (and died) to deliver the certificates to the designated individuals. Subsequently, Mrs. Lee cashed some of the certificates, but returned the rest to Noble. Mrs. Lee died, and Noble delivered the certificates to the persons designated by Mrs. Lee. (153 Cal. at pp. 247-249.)

Learned asserted at trial that the transaction was a valid trust. The trial court found that Mrs. Lee did not declare nor create a trust. The appellate court determined that the trial court's judgment was sustained by the evidence. (153 Cal. at p. 248.)

First, the Supreme Court found that Noble was not the trustee because the certificates did not convey any title to him. Next, the court held that *although a grantor may make himself a trustee* for the benefit of another and although the evidence would have supported such a finding, it was the trial court's duty to determine the facts, and the evidence could support a finding that a trust was not contemplated by Mrs. Lee. (153 Cal. at pp. 251-252.) Thus, the court in *Noble* held that substantial evidence supported the trial court's finding that a trust was never contemplated or created by Mrs. Lee. *Noble* did not, as the Department states, find that Mrs. Lee "constituted herself as the trustee." It found no vesting of a present interest because a trust was never created.

Here, as in *Noble*, Myrtle technically divested herself of title to her property when she placed it into a trust; she passed a present interest. The document here was a valid trust agreement and therefore not a testamentary document subject to the statute of wills.

The heirs rely on Probate Code section 5000 as further support for their argument the trust document was not testamentary. Probate Code section

5000 provides that a "provision for a nonprobate transfer on death in [a] . . . trust . . . is not invalid because the instrument does not comply with the requirements for execution of a will, and this code does not invalidate the instrument." In the Law Revision comment to this section it is stated: "The sole purpose of this section is to prevent the transfers covered by the section from being treated as testamentary." (20 Cal. Law Revision Com. Rep. (1990) pp. 1001, 1395.)

The above authorities demonstrate that the trust here was not testamentary. Although the Department's arguments on these points fail because the trust document was valid and was not technically testamentary, this does not end the Department's case. The *Demartini, Tennant* and *Noble* cases revolved around questions of how property would pass upon someone's death and whether the document passing the property needed to comply with the statute of wills. Probate Code section 5000 also concerns whether particular documents must comply with the statute of wills. The question here is much broader and involves an interpretation of what Congress intended when it used the term "estate" in 42 United States Code section 1396p. It involves whether the term "estate" includes nonprobate transfers on death.

As previously set forth, 42 United States Code section 1396p(b)(1)(B), allows a state to recover from the "estate" costs paid on behalf of an individual who was 65 years of age or older when he received assistance. Welfare and Institutions Code section 14009.5 provides that the Department may make a claim, under certain circumstances, against "the estate of the decedent, or against any recipient of the property of that decedent by distribution or survival . . . ."

Defendants contend that in enacting Welfare and Institutions Code section 14009.5, California enlarged the scope of recovery allowed under federal law by allowing recovery from outside the estate. Defendants rely on *Citizens Action League* v. *Kizer* (9th Cir. 1989) 887 F.2d 1003. Defendants contend that the term "estate" as used in 42 United States Code section 1396p must be limited to the common law definition. Defendants also assert that the amendments to 42 United States Code section 1396p, which include a broad definition of the term "estate," show an intent to extend the previous law beyond what it originally was.

In *Citizens Action League* v. *Kizer, supra,* 887 F.2d at page 1003, the Ninth Circuit found that the Department could not recover benefits from persons who succeed by survivorship to property owned in joint tenancy with former benefit recipients because, under the common law, joint tenancy property is not part of the "estate." First, the court held that because Congress used a

common law term, the court must look to its common law meaning in construing the statute. (*Id.* at p. 1006.) The court then found that at common law, joint tenancy property is excluded from the decedent's "estate." (*Ibid.*) The court rejected the views expressed in the letter of the administrator of the United States Health Care Financing Agency which stated that agency has not construed "estate" to be limited to the probate estate, and states can consider property which passes under a joint tenancy agreement for purposes of recovering under Medicaid. The court rejected this letter because it lacked the " 'indicia of deliberative administrative review.' " (*Id.* at p. 1007.) The court of appeals also rejected the district court's rationale and found that there is nothing inappropriate in entering into a joint tenancy agreement to avoid Medicaid recovery, because it was not unauthorized; in fact, many individuals became joint tenants in an arrangement that Congress wanted to encourage under which at-home care services were provided in exchange for a place to live, both during the provision of care and after the recipient's death. (*Id.* at p. 1008.) The court of appeals concluded: "Because 'estate' under common law does not include property formerly held in joint tenancy, and because the HCFA letter is not compelling on this issue, we conclude that the California statute is impermissibly broad and is inconsistent with federal Medicaid law." (*Ibid.*)

■ Although *Kizer* is a federal case interpreting a federal statute, because it is a lower federal court case and not a United States Supreme Court case, the decision is merely persuasive and is not binding on this court.

"Where lower federal court precedents are divided or lacking, state courts must necessarily make an independent determination of federal law. Any rule which would require the state courts to follow in all cases the decisions of one or more lower federal courts would be undesirable, as it would have the effect of binding the state courts where neither the reasoning nor the number of federal cases is found persuasive. Such a rule would not significantly promote uniformity in federal law, for the interpretation of an act of Congress by a lower federal court does not bind other federal courts except those directly subordinate to it." (*Rohr Aircraft Corp.* v. *County of San Diego* (1959) 51 Cal.2d 759, 764-765 [336 P.2d 521].)

■ We have found no other published federal cases discussing the definition of "estate" as found in 42 United States Code section 1396p. Therefore, with the exception of *Kizer*, federal precedents are lacking on this question and this court is free to adopt its own interpretation.

We believe the definition of "estate" utilized in *Kizer* is too limited when viewed in conjunction with the purposes of the act. The dissent of Judge

Canby in *Kizer* points out the weaknesses of the *Kizer* opinion and is, in our view, the better reasoned position.

"As the majority has made clear, there is some doubt what Congress meant when it permitted a state to recover benefits properly paid to a person over age 65 from that person's 'estate.' 42 U.S.C. § 1396p(b)(1)(B). The common law definition of 'estate,' which the majority adopts, imposes on the states a system that makes recovery depend on a technical distinction that has nothing necessarily to do with the purposes of the Medicaid program or of the exception permitting recovery of benefits furnished to persons over age 65. As the district court pointed out, an heir that furnishes nursing assistance to a Medicaid recipient in return for a bequest of the recipient's residence will be subject to a claim by the state. A joint tenant who has rendered no services and is not in need will be subject to no such claim when he or she takes the residence by survivorship. Whether the state may seek its recovery depends on a legal formality, not on any distinction rationally related to Congress' purposes.

"California's interpretation of section 1396p(b)(1)(B), supported by the Secretary of Health and Human Services, eliminates this irrationality by permitting recovery from heirs and joint tenants alike. When hardship is involved, the State makes allowances for that exigency across the board, regardless whether an heir or joint tenant is involved. Thus, California's statute does not apply at all when the recipient passes a residence to a surviving spouse, or minor or disabled children. When enforcement of the state's statute against heirs or survivors would cause substantial hardship, the Department has authority, which it has exercised, to waive its claim in whole or part. California also asserts that it does not enforce its claims to deprive the heir or joint tenant of a residence; the state accepts a lien enforceable only at sale.

"Because a broad definition of 'estate' permits California to administer a rational system of recovery, and the common law definition does not, I would opt for the former. The goal of statutory interpretation is to further, in as sensible a fashion as possible, the congressional purposes behind the statute. California's construction, supported by the Secretary, does that. The common law definition does not. I would affirm." (*Citizens Action League* v. *Kizer, supra,* 887 F.2d at pp. 1008-1009 (dis. opn. of Canby, C. J.).)

" 'The fundamental rule of statutory construction is that the court should ascertain the intent of the Legislature so as to effectuate the purposes of the law.' " (*Great Lakes Properties, Inc.* v. *City of El Segundo* (1977) 19 Cal.3d 152, 163 [137 Cal.Rptr. 154, 561 P.2d 244].) Courts should give effect to an

entire statute and should not adopt an interpretation which would render language useless in many of the cases it was intended to govern. (*Williams* v. *Superior Court* (1993) 5 Cal.4th 337 [19 Cal.Rptr.2d 882, 852 P.2d 377].)

One of the express purposes of the Medicaid Act "is to enable 'each state, as far as practicable under the conditions in such state, to furnish . . . medical assistance on behalf of families with dependent children and of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services . . . .' (42 U.S.C. § 1396.)" (*Cowan* v. *Myers* (1986) 187 Cal.App.3d 968, 977 [232 Cal.Rptr. 299].)

Allowing states to recover from the estates of persons who previously received assistance furthers the broad purpose of providing for the medical care of the needy; the greater amount recovered by the state allows the state to have more funds to provide future services. Furthermore, if a person has assets available to pay for the benefits, then the state should be allowed to recover from those assets because that person was not fully entitled to all benefits. As pointed out by Judge Canby in his dissent in *Kizer*, states may make allowances when hardship is involved, and California does so.

 The term "estate" is a comprehensive term. One of its common uses is to describe the assets of a deceased individual. (*Estate of Glassford* (1952) 114 Cal.App.2d 181, 189-190 [249 P.2d 908, 34 A.L.R.2d 1259].) But "estate" is a word of varied meaning, and the meaning of the term depends a great deal on the way in which it is used. (*In re Reynolds' Estate* (1936) 274 Mich. 354 [264 N.W. 399, 401-402].) "The meaning of the word 'estate' is to be ascertained from the circumstances under which it is used. [Citations.] The word has not been limited to property passing under a will or by intestacy. [Citation.] 'It should be construed in a sense which will accomplish and not defeat the purpose of the instrument in which it is used.'" (*In re Sachs' Estate* (1947) 73 N.Y.2d 160, 161.)

 The word "estate" is ambiguous and could mean probate estate or taxable estate. (*Estate of Armstrong* (1961) 56 Cal.2d 796, 801 [17 Cal.Rptr. 138, 366 P.2d 490].) In *Estate of Carley* (1979) 90 Cal.App.3d 582 [153 Cal.Rptr. 528], the decedent's will stated that estate and inheritance taxes were to be paid from "my estate." The appellate court held that joint tenancy property was part of the gross estate or taxable estate and that it was subject to the estate tax burden. (*Id.* at pp. 586-588.) The term "estate" was thus given its broad meaning so as to more fairly and evenly distribute the taxes to be paid by those who received property from the decedent.

Evidence that Congress intended the term "estate" to be broader than just the portion of the estate which passes by will or intestacy can be found in the

Internal Revenue Code. In 26 United States Code, section 2038 provides that revocable transfers shall be included in the value of the gross estate for federal taxes. If Congress had intended to limit recovery from only the probate estate, it could have used such a definite term when it wrote the Medicaid statute. Congress chose to use the broad term "estate."

Giving "estate" its broadest meaning furthers the purpose of the Medicaid Act; it does not require one to resort to technical differences in the character of how property is owned by a recipient of Medicaid Act benefits in order to permit recovery.

Defendants argue that the changes made in 42 United States Code section 1396p in 1993 show that Congress was cognizant that the former law limited the state's ability to recover assets from an individual's estate, and Congress expanded the law. Defendants point to the fact that the changes are effective as of October 1, 1993, as recognition by Congress that the changes were not merely declaratory of existing law.

The changes to 42 United States Code section 1396p occurred as part of the Omnibus Budget Reconciliation Act of 1993 (OBRA). As part of this act, many changes were made to the Medicaid statutes. Subdivision (b) of 42 United States Code section 1396p, was changed in many respects. Former subdivision (b) had no provisions regarding individuals who also had long-term care insurance. New subdivision (b) contains new rules related to these individuals. The age limit in subdivision (b)(1)(B) was lowered from 65 to 55 in the new statute. The new subdivision (b) also requires that states establish procedures to waive subdivision (b) under conditions of undue hardship. This was not a requirement of former subdivision (b). Subdivision (b)(4) now contains a definition of the term "estate." It provides:

"(b)(4) For purposes of this subsection, the term 'estate', with respect to a deceased individual—

"(A) shall include all real and personal property and other assets included within the individual's estate, as defined for purposes of State probate law; and

"(B) may include, at the option of the State (and shall include, in the case of an individual to whom paragraph (1)(C)(i) applies), any other real and personal property and other assets in which the individual had any legal title or interest at the time of death (to the extent of such interest), including such assets conveyed to a survivor, heir, or assign of the deceased individual through joint tenancy, tenancy in common, survivorship, life estate, living trust, or other arrangement." (42 U.S.C. § 1396p(b)(4).)

Former subdivision (b) did not contain a definition of "estate." The statute provides that the amendments made to subsection (b) shall not apply to individuals who died before October 1, 1993.

If all that had been changed in subdivision (b) was the addition of the definition of "estate," a strong argument could be made that Congress viewed the addition as a substantive change. But, as evidenced by the previous discussion, the new subdivision (b) contains major substantive changes and additions. The wording of the pertinent portion of the subdivision using the term "estate" remained unchanged. In 1993 Senate Report No. 103-403 (part of OBRA) under part (I), *"asset transfer and estate recovery,"* stated: "Legislation enacted as part of the OBRA 93 instituted more stringent limitations on sheltering assets for the purpose of qualifying for Medicaid. *Despite earlier provisions* that were intended to ensure that assets are used for the cost of care rather than given away, anecdotal reports and recent interview surveys of Medicaid officials suggest that nonpoor elderly persons are successfully using estate planning to avoid applying their wealth to the costs of long-term care services for the purpose of having Medicaid pay for their care." (Italics added.) Following a long discussion regarding sheltering of assets, the report went on to state that related amendments on estate recovery for Medicaid were included in the act. The language of the report, combined with the nature of the changes in the statute, can be viewed as showing that Congress was merely clarifying the original intent by expressly declaring the meaning of the words used in the act.

We find Congress intended the term "estate" to have a broad meaning. By including probate and nonprobate transfers on death in the estate, the purposes of the act will be better achieved and the broad definition will ensure that assets of a recipient are used for the cost of care rather than given away.

The judgment is affirmed. Both parties to bear their own costs.

Thaxter, J., and Harris, J., concurred.