The STATE of Indiana, Morgan County Office of the Department of Child Services, Appellant–Intervenor,

v.

Roland W. HAMMANS and Sue E. Hammans, Co–Trustees of the Nicholas Hammans Disability Trust and The Nicholas Hammans Disability Trust, Appellees.

No. 55A04–0606–CV–294.

Court of Appeals of Indiana.

Aug. 2, 2007.

---

Steve Carter, Attorney General of Indiana, David Steiner, Deputy Attorney General Indianapolis, IN, Attorneys for Appellant.

Arend J. Abel, Cohen & Malad, LLP Indianapolis, IN, Roger T. Coffin, Coffin, Coffin & Mayfield, Martinsville, IN, Attorneys for Appellees.

## OPINION

CRONE, Judge.

### Case Summary

The State of Indiana, Morgan County Office of the Department of Child Services, appeals the order authorizing payment to Roland W. Hammans and Sue E. Hammans ("the Hammanses"), co-trustees of the Nicholas W. Hammans Disability Trust ("the Disability Trust"), for their administrative services as co-trustees and for personal services rendered to their son, Nicholas. We affirm.

### Issue

The State raises one issue, which we restate as whether the trial court's order granting the Hammanses' petition for co-trustee fees and personal services rendered to Nicholas is clearly erroneous.

### Facts and Procedural History

On December 28, 1994, Nicholas was in an automobile accident. He sustained a traumatic brain injury, leaving him completely disabled and requiring twenty-four-hour supervision and care. Upon his discharge from the hospital in March of 1995, the Hammanses received the necessary training to care for him. This care included, but was not limited to, performing physical therapy, delivering medications via IV or injection, feeding him through a feeding tube, changing his tracheotomy tube, suctioning phlegm, and respiratory therapy.

On Nicholas's behalf, the Hammanses brought a lawsuit based on the accident, and the proceeds from the resulting settlement were placed in a guardianship estate supervised by the trial court. On April 17, 1996, the trial court established the Disability Trust, appointed the Hammanses as co-trustees, and funded it with $200,000 transferred from the guardianship estate. The Disability Trust was specifically set up so that Nicholas would remain eligible for Medicaid.[1] To qualify for Medicaid in Indiana, an applicant must meet both an income eligibility test and a resources eligibility test. If either the applicant's income or the value of the applicant's resources is too high, then the applicant does not qualify for Medicaid. *Sanders v. State Family & Soc. Servs. Admin.*, 696 N.E.2d 69, 71 (Ind.Ct.App.1998). To insure that Nicholas retained Medicaid eligibility, the Disability Trust was structured to meet the requirements of 42 U.S.C. § 1396p(d)(4)(A). This statute permits the creation of a trust, often referred to as "supplemental needs trust," "special needs trust," or "disability trust," the assets of which are excluded from determining an individual's Medicaid eligibility. 42 U.S.C. § 1396p(d)(4)(A) provides,

(4) This subsection [governing treatment of trust assets in determining Medicaid eligibility] shall not apply to any of the following trusts:

---

1. The Medicaid program is designed to provide medical assistance to needy persons whose income and resources are insufficient to cover the costs of health care. 42 U.S.C. § 1396 *et seq.; Sullivan v. Day*, 681 N.E.2d 713, 715 (Ind.1997). The program functions through a combination of federal and state statutory and regulatory authority. *See* 42 U.S.C. § 1396a; Ind.Code § 12–15–1–1. For a detailed presentation of the statutory background of the Medicaid program, see *Indiana Department of Public Welfare v. Payne*, 592 N.E.2d 714 (Ind.Ct.App.1992), *aff'd*, 622 N.E.2d 461 (Ind.1993). The Medicaid Act has been referred to as one of the " 'most completely impenetrable tests within human experience' " and " 'dense reading of the most tortuous kind.' " *Johnson v. Guhl*, 166 F.Supp.2d 42, 46 (D.N.J.2001) (quoting *Johnson v. Guhl*, 91 F.Supp.2d 754 (D.N.J.2000)).

**(A)** A trust containing the assets of an individual under the age 65 who is disabled (as defined in section 1382c(a)(3) of this title) and which is established for the benefit of such individual by a parent, grandparent, legal guardian of the individual, or a court *if the State will receive all amounts remaining in the trust upon the death of such individual* under a State plan under this subchapter.

(Emphasis added.)

The Disability Trust provides, in relevant part:

Whereas, the Grantor, Nicholas W. Hammans, remains unconscious and is unlikely to ever be self-supporting, however, [Nicholas] may have a normal life expectancy;

**Whereas,** the projected costs of [Nicholas's] care and medical and rehabilitation needs over his lifetime far exceed the resources currently available to him, including all sums received in settlement of his personal injury claims; and

**Whereas,** medical and rehabilitation technology is advancing at a rapid rate and during [Nicholas's] lifetime these advances may enable him to achieve a level of restoration and rehabilitation not currently possible; and,

**Whereas,** at the present time [Nicholas] is a Medicaid recipient, and it is [Nicholas's] intention that this "Disability Trust" satisfy the provisions of 42 USCS § 1396p(d)(4), commonly known as the "(d)(4) exceptions", and that during the lifetime of [Nicholas], the trust corpus and income will remain "unavailable", as a general resource of [Nicholas] under current Medicaid law; and,

. . .

**Whereas,** [Nicholas] acknowledges that in accordance with the provisions of this Trust, and in order to comply with

42 USCS § 1396p(d)(4), the State of Indiana or any other domiciliary State of [Nicholas] will receive all amounts remaining in the Trust upon the death of [Nicholas] up to an amount equal to the total medical assistance paid on behalf of [Nicholas] under a State Plan under 42 USCS §§ 1396 et seq.

**IT IS THEREFORE AGREED UPON AS FOLLOWS:**

1. *Trust Purpose.* The purpose of this Trust is to protect [Nicholas's] long term interests and to generally provide **supplemental care** during his lifetime, to make available to him such restorative and rehabilitation services that are or will become available to achieve as normal a physical and mental functioning as is possible and to increase the quality of his life after utilizing available assistance from governmental and private agencies and when such assistance or benefits are incomplete or insufficient, and not to replace assistance or benefits or to render [Nicholas] ineligible for any assistance or benefits to which he would otherwise be entitled or eligible, including Medicaid benefits.

. . . .

4. *Administration of Trust During [Nicholas's] Lifetime.*

. . . .

c. **Guidelines for the Co–Trustees' Exercise of Power of Distribution.** The [Hammanses] shall arrange for [Nicholas] to have services to enhance his quality of life to the greatest extent possible. [Nicholas] may require life-long rehabilitation services and the Trust is intended to allow [Nicholas] to receive such services. The expenditures that are contemplated are services provided for [Nicholas's] mental and physical rehabilitation, education, and training.

Examples of such services include but are not limited to the following:

. . .

(7) Expenditures for family members or other persons who provide special care or supervision to the extent of the reasonable value of services provided;

. . .

d. **Death of [Nicholas].** Upon the death of [Nicholas], the [Hammanses] *shall terminate the Trust and distribute the entire remaining balance of the Trust estate* as follows:

(1) The [Hammanses] shall pay to the State of Indiana (or any other State that provided Medicaid benefits to [Nicholas]), such amount of the Trust estate which is equal to the total medical assistance paid on behalf of [Nicholas] under a State plan (i.e. Medicaid) under 42 USCS §§ 1396 et seq., or whatever the amount of the Trust estate is necessary to meet the requirement of 42 U.S.C. § 1396p(d)(4)(A) or the corresponding provision of any successor Medicaid law.

Appellant's App. at 130–35 (emphasis added).

The trial court supervised the Disability Trust and approved all disbursements. On December 7, 2005, Nicholas unexpectedly died following a two-day illness. The Disability Trust had a balance of $143,860. The State's payments for Nicholas's medical care though Medicaid totaled $355,632.15.

On January 9, 2006, the Hammanses filed a verified petition seeking fees associated with the administration of the Disability Trust and compensation for the care they rendered to Nicholas and a petition to pay the Disability Trust's final attorney fees. On January 27, 2006, the trial court issued a notice of hearing to the Morgan County Division of Family and Resources.

On February 24, 2006, the State moved to intervene, which the trial court granted.

On March 1, 2006, a hearing on the Hammanses' petitions was held. On March 16, 2006, the parties filed memoranda of law. On March 22, 2006, the Hammanses amended their petition for attorney fees.

On March 27, 2006, the trial court issued an order authorizing payment of attorney fees of $2,500. On April 4, 2006, the trial court issued an order authorizing payment of $140,000 to the Hammanses for their administrative services as co-trustees of the Disability Trust and for personal services they provided to Nicholas. In relevant part, the order states:

8. The Court finds that the allegations of the petition filed herein are true and accurate and the testimony of the [Hammanses] . . . was creditable and uncontroverted. The Courts finds that no testimony was offered by the State.

9. The Court finds that the personal care and services provided by the [Hammanses] for the benefit of their disabled son from March 1995 until his death on December 7, 2005 was extraordinary and was performed with the expectation that compensation would eventually be authorized for the [Hammanses] prior to the death of the disabled beneficiary. The Court further finds that the [Hammanses], upon receiving special training, performed all of the tasks and services specified and set forth in paragraph 4 of their petition.

10. The Court finds that from the date the disability trust was established until the death of [Nicholas] on December 7, 2005, [Nicholas] was cared for by the [Hammanses] in their home on a continuous "round the clock" basis, except for brief periods of hospitalization.

11. The Court finds that from the date the disability trust was established

until the death of [Nicholas], the [Hammanses] provided and coordinated [Nicholas's] care for a continuous period of 3,519 days or a period of approximately 502 weeks. During this period, the [Hammanses] were away from [Nicholas] for only 2 days.

12. The Court finds that the testimony presented during the hearing on this petition established that during the 502 week period from the date that trust was established until the death of [Nicholas], Medicaid furnished a nursing staff to attend to [Nicholas] for a period of 40 hours per week. The [Hammanses] were available to provide care for [Nicholas] 128 hours per week. The Court finds that the [Hammanses] provided 76% of the total care of [Nicholas].

13. The Court finds that authorizing payment to the [Hammanses] at the rate of $15.00—$20.00 per hour is certainly a reasonable rate and a reasonable value for their services when compared to customary and usual charges of agencies providing similar services. The Court further finds that authorizing caregiver compensation for only one trustee caregiver at the rate of $5.00 per hour would equal a value exceeding the balance of funds on hand in the trust. Calculation: 502 weeks × 128 hours per week = 64,256 hours × $5.00 per hour = $321, 280.00. In the alternative, using the facts set forth in paragraph 5 of the petition, as modified by the testimony, the compensation would still exceed the balance of funds in the trust. Calculation: 3,519 (days)—2 (days caregivers were away from [Nicholas]) = 3,517 (days) × 12 (hr./day) = 42,204 (hours) × $5.00 (per hour) = $211,020.00.

14. The Court finds that the care giving services rendered by the [Hammanses] were consistent with the purpose for which the trust was established and were consistent with the specific terms of the trust.

15. The Court finds that all care giving services and all trust administration services provided by the [Hammanses] were for the sole benefit of [Nicholas] and the [Hammanses] performed such services with the expectation of being compensated at a reasonable rate of compensation.

16. The Court finds that the [Hammanses] actively pursued new ideas and new technology during the administration of the disability trust to accelerate [Nicholas's] recovery. The [Hammanses] purchased equipment to enhance the benefits of physical therapy and the [Hammanses] deliberately postponed any request for authority to compensate themselves for the reason that if medical advances in brain cell implants would become available in time to permit [Nicholas] to experience a substantial recovery, the [Hammanses] wanted to insure that funds would be available to pay for this technology.

17. The Court finds that [Nicholas] died suddenly on December 7, 2005 following a two[-]day illness. The Court further finds that such an event was a circumstance not known to the [Hammanses] and not something that could be anticipated by them when the disability trust was first established.

18. The Court finds that the sudden death of [Nicholas] was an event that prevented the [Hammanses] from having sufficient time to apply to the Court for compensation for services rendered for the benefit of [Nicholas] prior to his death.

19. The Court finds that even if a petition for trustee fees had been filed shortly after [Nicholas] became ill, it is unlikely that an order would have been issued prior to [Nicholas's] death, and this is also a circumstance not known to the [Hammanses] nor anticipated by

them when they entered into the trust agreement on behalf of [Nicholas].

20. The Court finds that it is completely illogical to conceive of the notion that the significance of the exact moment of death of [Nicholas] and the *timing* of an order authorizing payment of a legitimate expense in consideration for valuable services delivered to [Nicholas] by the [Hammanses] over a period of many years, would dictate the outcome for the [Hammanses]. In this instance, if the Court had issued an order authorizing payment to the [Hammanses] for personal services immediately prior to the death of [Nicholas], there would apparently be no cause for objection by the State. On the other hand, an order issued by the Court immediately following the death of [Nicholas] authorizing payment to the [Hammanses] is met with opposition from the State. The Court finds that the State's position is contrary to logic and against public policy when the [Hammanses] have essentially "come to the rescue."

21. The Court finds that the care giving services rendered by the [Hammanses] enabled [Nicholas] to remain in the home of his parents and completely prevented long term institutional care. The Court finds that if it had not been for the time, effort, skills and absolute dedication of the [Hammanses], the cost to the state for [Nicholas's] institutional care would have been several times greater then the claim submitted to the Court. In this instance, the Court finds that public policy dictates that compensation be authorized for the [Hammanses] who spared the State many thousands of dollars.

*Id.* at 8–10.

Only $1,360 remained in the Disability Trust for reimbursement to the State. On May 5, 2006, the trial court approved an additional payment of $750 for attorney fees.

The State appeals.

**Discussion and Decision**

■ The State challenges the trial court's order awarding the Hammanses the bulk of the trust corpus for co-trustee fees and for personal services provided to Nicholas. The trial court supported its order with twenty-two paragraphs it designated as findings.

Sua sponte findings control only as to the issues they cover and a general judgment will control as to the issues upon which there are no findings. A general judgment entered with findings will be affirmed if it can be sustained on any legal theory supported by the evidence. When a court has made special findings of fact, an appellate court reviews sufficiency of the evidence using a two-step process. First, it must determine whether the evidence supports the trial court's findings of fact; second, it must determine whether those findings of fact support the trial court's conclusions of law. Findings will only be set aside if they are clearly erroneous. Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference. A judgment is clearly erroneous if it applies the wrong legal standard to properly found facts.

*Yanoff v. Muncy,* 688 N.E.2d 1259, 1262 (Ind.1997) (citations and quotation marks omitted).

■ In assessing whether findings are clearly erroneous, we will not reweigh the evidence nor judge the credibility of the witnesses. *Pitman v. Pitman,* 721 N.E.2d 260, 263–64 (Ind.Ct.App.1999), *trans. denied* (2000). Rather, we consider the evidence that supports the judgment and the reasonable inferences to be drawn therefrom. *Id.* A finding or conclusion is

clearly erroneous when our review of the evidence leaves us with the firm conviction that a mistake has been made. *Yanoff*, 688 N.E.2d at 1262. While we defer to the trial court's findings of fact, we do not defer to its conclusions of law. *In re the Estate of Powers*, 849 N.E.2d 1212, 1216 (Ind.Ct.App.2006). Our review of questions of law is de novo. *Knoy v. Cary*, 813 N.E.2d 1170, 1171 (Ind.2004).[2]

Specifically, the State argues that the trial court's order is contrary to the express terms of paragraph 4(d) of the Disability Trust and the federal Medicaid statute pursuant to which it was drafted, 42 U.S.C. § 1396p(d)(4)(A). The meaning and effect of 42 U.S.C. § 1396p(d)(4)(A) have not been addressed in Indiana. While other jurisdictions have applied the statute in other contexts, the circumstances presented in this case are unique.[3] Thus, the question presented is one of first impression in the United States.

■■■■ To resolve this issue, we are called upon to apply the terms of the trust instrument. In doing so, we are guided by the following principles:

> The primary purpose of the court in construing a trust instrument is to ascertain and give effect to the settlor's intention. Indiana follows "the four corners rule" that "extrinsic evidence is not admissible to add to, vary or explain the terms of a written instrument if the terms of the instrument are susceptible of a clear and unambiguous construction." Accordingly, where a trust is capable of clear and unambiguous construction, under this doctrine, the court must give effect to the trust's clear meaning without resort to extrinsic evidence.....
>
> A document is not ambiguous merely because parties disagree about a term's meaning. Rather, language is ambiguous only if reasonable people could come to different conclusions as to its meaning.

*Univ. of S. Ind. Found. v. Baker*, 843 N.E.2d 528, 532 (Ind.2006) (citations omitted).

---

**2.** The State asserts that many of the trial court's findings are actually legal conclusions regarding its interpretation of the Disability Trust. *See Fraley v. Minger*, 829 N.E.2d 476, 482 (Ind.2005) ("In the event the trial court mischaracterizes findings as conclusions or vice versa, we look past these labels to the substance of the judgment."). We are aware that some of the trial court's findings are legal conclusions, although we do not agree precisely with the State's categorizations, and we have adjusted our review accordingly.

**3.** The State cites a number of cases acknowledging that § 1396p(d)(4)(A) requires distribution of trust assets to the State for Medicaid reimbursement upon the death of the beneficiary, but none addressed the issue before us. *See Johnson v. Guhl*, 166 F.Supp.2d 42, 50 (D.N.J.2001) (concluding that federal Medicaid statutes did not preclude state from requiring payback provision in community spouse annuity trusts); *Ex Parte S. Carolina Dep't of Health & Human Servs.*, 364 S.C. 527, 614 S.E.2d 609, 611 (S.C.2005) (affirming trial court's placement of insurance proceeds into special needs trusts before reimbursing Medicaid and declaring that Medicaid was entitled to receive any funds remaining in trusts upon children's death); *Stell v. Boulder County Dep't of Soc. Servs.*, 92 P.3d 910 (Colo. 2004) (holding that state was entitled to reimbursement from disability trust for medical benefits only after trustee paid federal and state taxes on trust income); *Matter of Kennedy*, 3 Misc.3d 907, 779 N.Y.S.2d 346 (N.Y.Sur. Ct.2004) (approving use of Social Security disability payments to fund special needs trust); *Lewis v. Dep't of Soc. Servs.*, 61 S.W.3d 248 (Mo.Ct.App.2001) (holding that creation of special needs trust for child did not render father's child support amount unjust or inappropriate); *and Corcoran v. Dep't of Soc. Servs.*, 271 Conn. 679, 859 A.2d 533 (Conn. 2004) (holding that testamentary trust was not "special needs" trust under federal law, as state had no right to reimbursement after death of beneficiary).

■ Additionally, since 42 U.S.C. § 1396p(d)(4)(A) is necessary to the resolution of the issue before us, we observe that statutory interpretation is a question of law reserved for the courts. *Heaton & Eadie Prof'l Servs. Corp. v. Corneal Consultants of Ind., P. C.,* 841 N.E.2d 1181, 1186 (Ind.Ct.App.2006). When confronted with a dispute as to the meaning of a statute, our first task is to determine whether the legislature has spoken clearly and unambiguously on the point in question. *City of N. Vernon v. Jennings Nw. Reg'l Utils.,* 829 N.E.2d 1, 4 (Ind.2005). If a statute is unambiguous, then we need not and cannot construe it; rather, the words and phrases must be taken in their plain, ordinary, and usual sense. Ind.Code § 1–1–4–1; *Vanderburgh County Election Bd. v. Vanderburgh County Democratic Cent. Comm.,* 833 N.E.2d 508, 510 (Ind.Ct. App.2005). Only when a statute is susceptible to more than one reasonable interpretation is it deemed ambiguous and open to judicial construction. *Med. Assurance of Ind. v. McCarty,* 808 N.E.2d 737, 741 (Ind. Ct.App.2004). We presume that the legislature intended its language to be applied logically and consistently with the underlying goals and policy of the statute. *KPMG, Peat Marwick, LLP v. Carmel Fin. Corp.,* 784 N.E.2d 1057, 1060 (Ind.Ct. App.2003). Therefore, we will construe the statute so as to "prevent absurdity and to advance public convenience." *Id.* A statute's meaning and interpretation are to be ascertained not only from the phraseology of the statute but also by considering its nature, design, and the consequences that flow from the reasonable alternative interpretations of the statute. *In re K.B.,* 793 N.E.2d 1191, 1197 (Ind.Ct.App.2003).

■ With these principles in mind, we turn to the specifics of the case at bar.

The State claims that according to both paragraph 4(d) of the Disability Trust and 42 U.S.C. § 1396p(d)(4)(A), the Hammanses were required to pay the entire remaining amount of the Trust ($143,860) to the State upon Nicholas's death. Paragraph 4(d) provides that, "upon the death of Nicholas, *the Hammanses shall terminate the trust* and *distribute the entire remaining balance* of the Trust estate" to the State up to an amount equal to the total medical assistance paid on behalf of Nicholas under the State's Medicaid plan, or whatever is necessary to meet the requirements of 42 U.S.C. § 1396p(d)(4)(A). Appellant's App. at 135 (emphases added). Section 1396p(d)(4)(A) provides that the assets in a trust that is established for the benefit of the Medicaid recipient and authorizes the State to "receive all amounts remaining in the trust upon the death of the recipient," shall be excluded from eligibility considerations.

We first observe that the parties agree that the Disability Trust was drafted to comply with § 1396p(d)(4)(A). Section 1396p(d)(4)(A) has two requirements. First, it requires that a trust must be created to benefit the Medicaid recipient. The chief function of the Disability Trust, as expressed in paragraph 1, is to provide supplemental care to Nicholas to increase the quality of his life, after assistance from governmental and private agencies has been exhausted, and not to replace such assistance. Appellant's App. at 132.[4] Thus, the Disability Trust is in harmony with the first requirement of § 1396p(d)(4)(A), and the State does not suggest otherwise.

In furtherance of this chief purpose, paragraph 4(c) of the Disability Trust directs the co-trustees to "arrange for [Nich-

---

**4.** The State Medicaid Manual § 3259, 405 Indiana Administrative Code 2–3–22(i)(*l*), and Program Policy Manual for Cash Assistance § 2615.7520.05 also provide that a special needs trust must be established for the sole benefit of the disabled individual.

olas] to have services to enhance his quality of life to the greatest extent possible." Paragraph 4(c)(7) authorizes expenditures for family members or other persons who provide special care or supervision to the extent of the reasonable services provided. Also, paragraph 4(d)(6) grants the Hammanses all the powers set forth in Indiana Code Section 30–4–3–3, authorizing the trustee to perform every act necessary or appropriate for the purposes of the trust and providing a non-inclusive list of examples. Appellant's App. at 136. We note that the State does not challenge the trial court's findings that the Hammanses received special training and cared for Nicholas in their home on a continuous "round the clock" basis for a continuous period of 3, 519 days, or approximately 502 weeks, providing 76% of Nicholas's care. The State does not challenge the finding that these care-giving services were consistent with the purposes of the Disability Trust. Further, the State does not contend that the care-giving services provided by the Hammans fall outside the range of expenditures authorized by paragraph 4(c)(7) and does not challenge the manner in which the trial court valued the Hammanses' services.

■ Section 1396p(d)(4)(A) also requires that the State "receive all amounts remaining in the trust upon the death of the [Medicaid] recipient." To comply with this requirement, the Disability Trust requires that upon Nicholas's death, the Hammanses (1) terminate the trust and (2) distribute the entire remaining balance of the Trust to the State up to the amount the State paid to Nicholas through Medicaid. Accordingly, to terminate the Disabil-ity Trust, the Hammanses were necessarily required to settle all claims, and the trial court would have to approve all expenditures. "A trustee has an equitable right to reimbursement for all appropriate and reasonable costs incurred in the execution of the trust." *Matter of Trust of Loeb*, 492 N.E.2d 40, 44 (Ind.Ct.App.1986). The expenses of a trustee in the execution of his trust are a lien upon the estate, and the trustee must be reimbursed before he or she is compelled to release the trust funds. *Curran v. Abbott*, 141 Ind. 492, 497, 40 N.E. 1091, 1093 (Ind.1895). After the trust is terminated, any remaining amount would be used to reimburse the State for Medicaid payments. It would be absurd to interpret the trust and the statute in such a way as to condition the payment of legitimate creditors upon the physical receipt of funds from the trust prior to the death of the beneficiary.[5] If creditors were only able to seek and receive reimbursement for health care services before the death of the beneficiary, it would denigrate the level of care available to the beneficiary. Thus, logic dictates that the trust corpus becomes subject to distribution only when the process of terminating the trust is completed.

While the State does not contend that expenses actually incurred in the administration of the Disability Trust are irrelevant to the calculation of the remaining balance, it takes issue with the Hammanses' assertion that they were creditors entitled to receive payment from the Disability Trust after Nicholas died. The State asserts that the Hammanses did not advance any claims for care-giving services during

---

5. The absurdity of designating the death of the beneficiary as the event that terminates a creditor's right to reimbursement is illustrated by the following questions that would then be raised. To receive compensation must creditors submit a claim to the trustees before the beneficiary's death? Must the trustees file a petition for court approval of the claim before the beneficiary's death? Must the court have approved the claim prior to the death? Must the creditor actually be in physical receipt of the payment before the beneficiary's death? Must the check have cleared?

Nicholas's lifetime and that they volunteered their services out of love for their son. The State also emphasizes that the Hammanses intended to preserve the bulk of the Disability Trust while their son was alive so that resources would be available if new medical treatments were developed.

It was the province of the trial court to assess the credibility of the Hammanses' claims for care-giving services, and the trial court found the Hammanses' testimony to be creditable and found their claims for care-giving services to be legitimate. Our review of the record reveals that the evidence supports the trial court's findings that the Hammanses performed care-giving services as contemplated by the Disability Trust and that they expected to be reimbursed for their services only after it was clear that medical advances that would benefit Nicholas would not become available. While the Hammanses' forbearance in seeking compensation may be some evidence that they volunteered their services, such forbearance, under the facts present here, does not preclude a finding that compensation is owed. In addition, the Hammanses' intent to preserve the trust corpus during their son's lifetime so that funds would be available for new medical treatments is simply not in conflict with their intent to receive compensation for their services. In fact, the Hammanses' decision to keep funds available for medical treatments is in harmony with the chief purpose of the Disability Trust. In sum, the services provided by the Hammanses fulfilled the essential function of the Disability Trust and were expenditures authorized under the terms of the trust instrument. The State does not suggest that the terms of the Disability Trust do not comply with 42 U.S.C. § 1396p(d)(4)(A). Accordingly, we conclude that the trial court's order authorizing these expenditures is not in conflict with either the terms of the Disability Trust or 42 U.S.C. § 1396p(d)(4)(A).[6]

In determining that the trial court properly authorized compensation for the Hammanses' care-giving services, we recognize that the exception created by 42. U.S.C. § 1396p(d)(4)(A) serves important public policy considerations; namely, that reimbursing the State for funds it has expended through Medicaid for medical assistance increases the availability of funds for the future medical assistance to other needy persons. *See Estate of Jobe*, 590 N.W.2d 162, 166 (Minn.App.1999) ("allowing a state to recover medical assistance benefits previously paid furthers the broader purpose of funding future services to the medically needy"); *Estate of Wirtz*, 607 N.W.2d 882, 885–86 (N.D.2000)(" 'Allowing states to recover from the estates

**6.** In its reply brief, the State argues that in *Stell*, 92 P.3d 910, the Colorado Supreme Court "determined that with respect to a special needs trust under 42. U.S.C. § 1396p(d)(4)(A), upon the death of the beneficiary, federal and state taxes should be paid before reimbursing the State for Medicaid funds *but that other expenses are secondary to the taxes and Medicaid reimbursement owed to the government.*" Appellant's Reply Br. at 10 (emphasis added). While it is correct that the *Stell* court held that a trustee may pay federal and state taxes from the corpus of the trust before reimbursing the state for Medicaid assistance, 92 P.3d at 916, whether other expenses are secondary to taxes and Medicaid

reimbursement was not in issue there. The lower appellate court had ruled that burial and funeral expenses could not be paid ahead of the state's claim for Medicaid reimbursement, but Stell did not take issue with that ruling. We would note that the appellate court based this ruling on Colorado's disability trust statute, section 15–14–412.8, which contained a provision specifically requiring that "no person is entitled to payment from the remainder of the trust until the state medical assistance agency has been fully reimbursed for the assistance rendered to the person for whom the trust was created." Indiana does not have a comparable statute.

of persons who previously received assistance furthers the broad purpose of providing for the medical care of the needy; the greater amount recovered by the state allows the state to have more funds to provide future services.' ") (quoting *Belshe v. Hope,* 33 Cal.App.4th 161, 38 Cal. Rptr.2d 917, 925(Cal.App.1995)). Given the facts of this case, we cannot say that the trial court's order authorizing payment to the Hammanses as legitimate creditors of the Disability Trust for services performed prior to the beneficiary's death was clearly erroneous.

Affirmed.

BAKER, C. J., and ROBB, J., concur.